227 N.J. Super. 449 (1988)
547 A.2d 1134
49 PROSPECT STREET TENANTS ASSOCIATION, LUCINDA CURRY, COLINWOOD BENJAMIN, VICTOR HERRERA, MARLENI HERRERA, FRANK BRANCH, BEVERLY BRANCH, EDWIN SIMON, BERYL SIMON, DORIS FAIRCLOTH, SHIRLEY ASHE, BARBARA BRODIE AND JOSEPH SMITH, PLAINTIFFS-RESPONDENTS-APPELLANTS,
v.
SHEVA GARDENS, INC., A NEW JERSEY CORPORATION; BAT-SHEVA HALPERIN, AND NATALIE DEVELOPMENT, A NEW YORK CORPORATION, DEFENDANTS-APPELLANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 2, 1988.
Decided August 22, 1988.
*452 Before Judges J.H. COLEMAN, O'BRIEN and HAVEY.
Lawrence P. Platkin argued the cause for appellants-respondents (Robinson, Wayne, Levin, Riccio & LaSala, attorneys; Lawrence P. Platkin, on the brief).
Cindy McKee argued the cause for respondents-appellants (Joan Pransky, attorney, Joan Pransky and Cindy McKee, on the brief).
*453 Margery F. Nathanson, Deputy Attorney General argued the cause for appellant-intervenor Attorney General of New Jersey (W. Cary Edwards, Attorney General, attorney; Andrea Silkowitz, Deputy Attorney General, of counsel; Margery F. Nathanson, on the brief).
Rutgers Urban Legal Clinic filed a brief for amici curiae, New Jersey Tenants Organization, East Orange Tenants Association, Orange Tenants Association and Consumers League of New Jersey (Patricia E. Rousseau, of counsel; Elizabeth J. Miller, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
These three appeals, generated by the same landlord-tenant relationship and arising out of the same trial, have been consolidated for all purposes. In their complaint plaintiff tenants assert various causes of action against their landlord, including violation of the Consumer Fraud Act, breach of warranty of habitability and intentional infliction of emotional distress. We affirm in part and reverse in part.

THE FACTS
Plaintiff 49 Prospect Street Tenants Association is an association comprised of tenants residing at 49 Prospect Street, East Orange. Although named as an appellant in plaintiffs' notice of appeal and respondent in defendants' notice of appeal, no judgment was entered in the association's favor and no argument is made on its behalf. The individually named plaintiffs were all tenants at 49 Prospect Street, a 55-unit, four-story apartment building which was purchased at an auction held by the city by defendant Sheva Gardens, Inc. (Sheva) on March 14, 1984 for $158,000. Title was transferred to defendant Bat-Sheva Halperin (Halperin) on October 4, 1984. Defendant Natalie Development, Inc. (Natalie) is a New York corporation qualified to do business in New Jersey, which has held itself out as *454 landlord of the building. The sole shareholder of both corporations is Bat-Sheva Halperin. Her husband Jack Halperin is president of both corporations.
According to the tenants, at the time Sheva purchased the building it was in livable condition, had an adequate heating system, hot and cold water, some security, and the grounds were for the most part well maintained. On the other hand, according to defendants, the building was partially vacant, infested with vermin, its heating system in a severe state of disrepair, and there was a significant lack of security. One witness described the building as being in a "shambles." Even one of the plaintiffs, M. Herrera, testified that her apartment was dirty and infested with bugs when she moved into it in December 1983.
At the end of the summer of 1984, leases were sent to the tenants which required security deposits. The particular lease received into evidence was sent to plaintiffs Frank and Beverly Branch, providing for a monthly rental of $375 with the tenant to pay for electricity, gas, hot water and heat. Previously, the Branches had paid $269 per month with utilities included. At a meeting between the landlord and the tenants after the new leases had been sent to them, the tenants were informed that the owners were considering converting the apartments to condominiums. Defendant's property manager testified that he believed the tenants would have to sign the new leases to stay in the building after rehabilitation.
The city's rent leveling administrator testified that the apartments were rent controlled. After she had received several complaints from the tenants regarding excessive rent increases, she met with representatives of defendants and advised them that such increases violated the city ordinance. By amendment to the rent control ordinance adopted in May 1984, "substantially rehabilitated" properties are permanently exempt from rent control. The amendment further exempts units from rent control when a tenant voluntarily vacates the unit. The rent *455 control administrator testified that defendants' representatives told her they were spending a lot of money on the property because they were under the impression they could decontrol the rent. An application filed by defendants for hardship rent increases beyond the 6% permitted by the ordinance was denied by the board since Sheva had not owned the property for one year before making the application as required by the ordinance.
In the spring of 1984, defendants engaged Shawn Construction Co., Inc. (Shawn) to rehabilitate the building, including installation of a new heating system. However, because of a dispute between defendants and Shawn as to payment, the project was substantially delayed. By that time Shawn had totally dismantled the central heating system. Defendants concede that employees of Shawn broke a significant number of windows and removed several hot water boilers and other fixtures from the building. A new contractor, Davis Construction (Davis), was hired purportedly "to get the building completed as soon as possible within the code." However, for a substantial period of time the building was without heat and some apartments were without water. The building was infested with vermin, had many broken windows, had been invaded by squatters since doors and door locks were broken and was totally lacking any security.
During this period, subsequent to defendants' acquisition of the property, many of the tenants moved from the building. The individual plaintiffs, however, remained for various periods of time until the last of them were compelled to vacate by the city on August 9, 1986, since the building had been declared unfit for human habitation.
In the interim, these tenants were subjected to substantial deprivations and hardships. As noted, they had no heat, except for space heaters provided by the landlord for which the tenants received a $2 per day abatement of their rent during the period the heaters were used. However, the cost of operating *456 the space heaters was ultimately borne by plaintiffs by way of an additional charge on their utility bills, which had been switched from the landlord to the tenants. The landlord had previously provided heat and paid for utilities. A representative from Public Service Electric & Gas Company testified to the substantial increase in the tenants' utility bills.
As noted, some of the tenants were deprived of water during a portion of the time. Plaintiff Colinwood Benjamin testified that in July and August 1984 he had water for only about one week and he had no water in his apartment in September, October and November 1984. He noted that during that period he was unable to cook, use the toilet or shower in his apartment. Other tenants testified to water damage which they suffered when sinks were removed from vacant apartments. Some of the tenants claimed their apartments were burglarized when all the locks were removed from the front doors. The mailman testified that he stopped going to the building's mailroom since it became flooded with sewage in the fall of 1984. New mail boxes provided by the post office prior to Sheva's purchase of the building were stolen.
Many of the tenants testified to illnesses suffered by them and their families during the winter 1984-1985. There was testimony that even during the trial, in December 1985 and January 1986, the apartments had no heat. Although the tenants had been given a list of other apartments owned by defendant to which they could move, a representative of the Essex County Tenants' Resource Committee testified that all of the other buildings were in bad condition and in bad neighborhoods, whereas 49 Prospect Street is in one of the best areas of East Orange. The record is unclear as to how many of the other tenants accepted the offer to move to other buildings.
Testimony relating to the condition of the building and hardships suffered by the tenants consumed a substantial number of trial days. Because of the inexperience of plaintiffs' counsel, much trial time was consumed by objections to her failure to *457 provide sufficient foundation for the introduction of evidence. There is no need to further recount in detail the deprivations and hardships suffered by the tenants. Suffice it to say that the jury found them to be substantial.

PROCEDURAL HISTORY
On May 28, 1985, plaintiffs filed an 11-count verified complaint. The complaint charged, (a) applicability and violation of the Consumer Fraud Act (N.J.S.A. 56:8-1 et seq.) (first and fourth counts); (b) plaintiffs Lucinda Curry and Marleni Herrera were induced to move from their apartments on the basis of fraudulent representations by defendants (second count); violation of the Anti-Eviction Act (N.J.S.A. 2A:18-61.1) (third count); negligent misrepresentation (fifth count); breach of the warranty of habitability (sixth count); negligent violation of their duty to provide safe and sanitary living conditions to plaintiff (seventh count); defendants' failure to provide, maintain and operate safe and sanitary living conditions was intentional or in wanton and reckless disregard for plaintiffs' health, safety and welfare (eighth count); intentional infliction of emotional distress in the nature of the tort of outrage (ninth count); the rent increases were in violation of the East Orange Rent Leveling Ordinance (tenth count), and the rent increases were unconscionable (eleventh count).
By order of December 4, 1985, the trial judge dismissed counts one and four, concluding that the Consumer Fraud Act, N.J.S.A. 56:8-2, was inapplicable to this landlord-tenant relationship.[1] On December 4, 1985, we granted leave to appeal and summarily reversed that portion of the order denying a jury trial on plaintiffs' claim of a violation of the warranty of *458 habitability as charged in the sixth count. Although we denied leave to appeal from the dismissal of the consumer fraud counts, we directed that the issue be submitted to the jury with appropriate instructions and interrogatories from which a judgment could be molded. On October 11, 1985, pursuant to N.J.S.A. 56:8-20 and R. 4:33-2, a motion by the attorney general to intervene for the limited purpose of interpreting the scope and application of the Consumer Fraud Act to landlord-tenant relationships was granted.
A protracted jury trial was conducted from December 11, 1985 through January 21, 1986, with the final verdicts returned on January 24, 1986. Extensive forms of interrogatories on each claim as to each individual plaintiff were submitted to the jury, including interrogatories on the consumer fraud claim in accordance with our instructions. The trial judge molded the various verdicts into a final judgment which was entered on February 21, 1986, embodying the compensatory and punitive damages awarded by the jury on all counts submitted to them except counts one and four dealing with consumer fraud. As to those counts, an advisory judgment was entered on May 21, 1986 setting forth the damages awarded by the jury, which were trebled and counsel fees fixed pursuant to N.J.S.A. 56:8-19. In an appendix to this opinion, we have reproduced copies of the form of interrogatories on each count and a supplemental set submitted to the jury and two schedules reflecting the jury's answers to those interrogatories from which the judgments were molded. Both parties moved for judgment notwithstanding the verdict or in the alternative for a new trial which the judge denied by separate orders of February 18, 1986 and March 6, 1986.[2] A special fiscal agent was appointed by order of February 21, 1986. There were several other post-judgment orders not relevant to these appeals.

*459 THE APPEALS
On April 7, 1986, plaintiffs appealed from the trial judge's decision that the Consumer Fraud Act did not apply to this ongoing landlord-tenant relationship and to the exclusion from the final judgment of the amounts awarded in the advisory judgment for violation of the Consumer Fraud Act. This appeal was assigned Docket No. A-3592-85T8. Plaintiffs' appeal was amended on June 10, 1986 to challenge the order of February 21, 1986 appointing the special fiscal agent.
Defendants filed a notice of appeal on March 27, 1986 from the appointment of the special fiscal agent by the order of February 21, 1986. Defendants also appealed from an order entered March 27, 1986 directing payment of $11,000 to the special fiscal agent for security guards. This appeal was assigned Docket No. A-3744-85T8. On May 8, 1986, defendant filed an amended notice of appeal questioning the equitable jurisdiction to appoint a special fiscal agent and expanding the appeal to contend that plaintiffs have obtained multiple recoveries on their causes of action, that plaintiffs were not entitled to recover for intentional infliction of emotional distress, and questioning whether punitive damages could be awarded after the jury failed to find compensatory or nominal damages as to certain plaintiffs.
Lastly, an appeal was filed by the attorney general on April 3, 1986, from the December 4, 1985 interlocutory order dismissing counts one and four charging violations of the Consumer Fraud Act. This appeal was assigned Docket No. A-3843-85T8. As noted, by consent of all of the parties, the three appeals were consolidated for all purposes by order of June 4, 1986. On June 30, 1987, we granted the motion of New Jersey Tenants Organization, East Orange Tenants Association, Orange Tenants Association, and Consumers League of New Jersey, to file a brief as amici curiae, but not to participate in oral argument.
*460 The final judgment in favor of plaintiffs has been fully satisfied by defendants and warrants for satisfaction issued by plaintiffs.[3] By consent order dated November 14, 1986, the special fiscal agent was discharged. Both parties have therefore abandoned their appeals with respect to the special fiscal agent.

THE ISSUES
Thus, on this appeal, plaintiffs and the attorney general contend that the Consumer Fraud Act was applicable to the landlord-tenant relationship between plaintiffs and defendants and was violated. This position is supported by the amici. In addition, plaintiffs contend that the compensatory damages awarded for violation of the Consumer Fraud Act, before trebling, should have been included in the final judgment and not withheld for inclusion only in the advisory judgment. Defendants as appellants assert that (1) no cause of action arises in this setting for the intentional infliction of emotional distress; (2) the jury's verdict with regard to the cause of action for intentional infliction of emotional distress is fatally defective, and (3) plaintiffs have received a duplicative recovery on the many causes of action arising out of the same factual setting.
*461 Accordingly, the three principle issues for our determination are (1) the applicability of the Consumer Fraud Act to this landlord-tenant relationship and whether it was violated; (2) whether plaintiffs were entitled to recover for intentional infliction of emotional distress with the subsidiary issue (a) whether the jury's verdict is fatally defective because they originally awarded zero compensatory damages to those plaintiffs who received punitive damages, which was corrected to award nominal damages of $1 after supplemental instructions from the trial judge, and (3) whether there have been duplicative recoveries. The issues will be treated in that order.

THE CONSUMER FRAUD ACT
In his oral decision rendered on November 22, 1985, the trial judge concluded that "the Consumer Fraud Act is not applicable to this ongoing residential landlord-tenant relationship where the tenants had been in possession at the time the defendants purchased the premises in question." Accordingly, he dismissed counts one and four of plaintiffs' complaint. Nevertheless, pursuant to our order of December 4, 1985, the consumer fraud issue was submitted to the jury with appropriate instructions and interrogatories. As part of our order we noted:
We are mindful that the various components of any Consumer Fraud Act damage award will be determined by the jury under the other claims asserted by plaintiffs, and we wish to preserve the Consumer Fraud Act elements of the damage award, if any, in a form that can be molded into a Consumer Fraud Act judgment without the necessity of a retrial, should plaintiff prevail on this aspect of an eventual appeal.
By their answers to the interrogatories on consumer fraud, the jury found as to each plaintiff that all three defendants used or employed unconscionable commercial practices, acts of deception, acts of fraud, acts of false pretense, acts involving a false promise, acts involving misrepresentation, and that defendants knowingly concealed, suppressed or omitted a material fact from each tenant regarding his or her tenancy and acted with intent that the tenant rely upon such concealment, suppression *462 or omission.[4] The last three interrogatories as to each plaintiff called upon the jury to determine whether that plaintiff had suffered any ascertainable loss of money or property as a result of the practices, acts or omissions of defendants and, if so, the amount of that loss.[5] The jury was then asked in interrogatory # 11 to determine which of five factors were determined by them to have caused plaintiffs' losses: (a) increased electric and gas bills; (b) loss of personal property; (c) reduction in rental value of plaintiff's apartment compared to the amount of rent paid (per month); (d) other losses of money or property, and (e) injury to person. The trial judge molded the jury's verdicts and entered an advisory judgment on the consumer fraud claims contained in counts one and four of the complaint, which he trebled and fixed attorneys' fees and costs pursuant to N.J.S.A. 56:8-19.[6]
Initially we address plaintiffs' contention that the compensatory damages awarded by the jury under the Consumer Fraud Act should have been included in the final judgment. The final judgment is made up of the sums awarded by the jury on counts other than consumer fraud. For example, plaintiff Curry was awarded $1 nominal damages for common law fraud as alleged in count two and $2,250 in punitive damages. For negligent misrepresentation she was awarded $200, received a rent abatement of $96 for breach of the warranty of habitability, and $200 for intentional and/or willful and wanton conduct. She was awarded nominal damages of $1 for intentional infliction of emotional distress and punitive damages on that count of $25,000. Thus she received total compensatory damages of *463 $402, to which was added prejudgment interest of $35.69, a rent abatement of $96, totaling $533.69 compensatory damages, and punitive damages of $27,250. This did not include the components of the ascertainable loss of money or property which the jury found she suffered as a result of the violation of the Consumer Fraud Act. For these the jury awarded $375 total increased electric and gas bills, $225 loss of property, and $400 reduction in rental value of her apartment,[7] or a total of $1,000. Therefore, the final judgment did not include the items labeled as ascertainable losses suffered by plaintiffs for consumer fraud, which were trebled pursuant to N.J.S.A. 56:8-19. While it is true that the dollar amount of ascertainable loss could have been awarded as part of the final judgment, the trial judge endeavored to separate sums awarded pursuant to the Consumer Fraud Act for inclusion in the advisory judgment to avoid confusion and a contention of duplicative recoveries. In any event, in light of our determination, this issue is now moot.
N.J.S.A. 56:8-2 in its present form provides in pertinent part:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; ....
Our duty in construing a statute is to determine the intent of the Legislature. AMN Inc. v. South Brunswick Tp. Rent Leveling Bd., 93 N.J. 518, 525 (1983). To that end we may consider any history which may be of aid. State v. Madden, 61 N.J. 377, 389 (1972). The act was originally enacted by the Laws of 1960, chapter 39, p. 138, § 2. As originally enacted, the term "sale" was defined as including "any sale, offer for sale, or attempt to sell." However, by the Laws of 1967, *464 chapter 301, § 1, the definition of the term "sale" was amended to read, "any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute." The words "or with the subsequent performance of such person as aforesaid" were also added as part of the 1967 amendment. The words "or real estate" were added by the amendment of the Laws of 1975, chapter 294, § 1.
As originally enacted, the act was exclusively enforced by the attorney general, but was amended in 1971 to permit a private right of action through which a successful plaintiff receives treble damages, reasonable attorneys' fees, filing fees and costs. Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 472-473 (1988).
Citing Trentacost v. Brussel, 82 N.J. 214 (1980), the trial judge recognized that tenants are consumers in the general sense and that the language of the statute would appear to apply to the rental of real estate, citing Febbi v. Div. of Employment Sec., 35 N.J. 601, 606 (1961), where the Supreme Court said that when the Legislature has clearly defined a term, the courts are bound by that definition. The judge then traced the development of landlord-tenant law citing some cases expanding tenants' rights and statutes enacted governing that relationship. The judge concluded that the Consumer Fraud Act "is much broader in scope and is much more specifically attuned to consumer problems...." Citing the principle of statutory construction that a special statutory provision dealing with a particular subject prevails over a general statute on the same subject, Zon. Bd. of Adj. v. Service Elec. Cable T.V., 198 N.J. Super. 370, 381 (App.Div. 1985), the judge concluded the Legislature did not intend to afford residential tenants the additional protections encompassed in the Consumer Fraud Act. He also stressed the fact that the complaints asserted by plaintiffs arose long after their tenancies had commenced. We disagree with the trial judge's conclusion.
*465 The plain language of the statute in its present form requires a conclusion that it applies to landlords as "sellers" and tenants as "consumers" since it applies to the rental of real estate. While there may be some question as to the isolated rental of an apartment in a two-family house, such as the isolated sale of a single-family residence by its owners in DiBernardo v. Mosley, 206 N.J. Super. 371 (App.Div.), certif. den. 103 N.J. 503 (1986), defendants in this case as landlord of a 55-unit, four-story apartment building, as well as several other apartment buildings, are obviously engaged in a commercial enterprise with the tenants as consumers. As the Court observed in Trentacost v. Brussel, supra:
When engaged in the business of providing shelter, present day landlords do not furnish merely four walls, a floor and a ceiling. They have come to supply, and tenants now expect, the physical requisites of a home. An apartment today consists of a variety of goods and services. At a minimum, the necessities of a habitable residence include sufficient heat, and ventilation, adequate light, plumbing and sanitation and proper security and maintenance. [82 N.J. at 225.]
It is undisputed that maintaining minimum conditions of habitability, including security, is beyond an individual tenant's control. Where the task involves the common areas of a multiple dwelling building, tenants efforts are entirely precluded. Id. at 226.
While he recognized these concepts, the trial judge based his conclusion on the admitted fact that the landlord-tenant relationship between these plaintiffs and these defendants first came into being when Sheva purchased the apartment building in May 1984. From this the trial judge correctly concluded that the actions of defendants did not "lure" or induce plaintiffs to enter into a landlord-tenant relationship with defendants. See Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 271 (1978). While this is true, it ignores significant language of N.J.S.A. 56:8-2, in which the Legislature has declared that use of the condemned practices, not only in connection with the "sale or advertisement of ... real estate," but also "with the subsequent performance of such person as aforesaid" to be an unlawful practice. We dealt with this language in New Mea *466 Const. Corp. v. Harper, 203 N.J. Super. 486, 499 (App.Div. 1985), concerning construction of a custom-built house. There, we noted that "the act relates not only to any unconscionable practices relating to the initial sale or advertisement, but also to the subsequent performance." Id. at 501. Plaintiffs' complaints do not deal with unconscionable commercial practices and deception by their previous landlord in inducing them into the landlord-tenant relationship. Rather, they complain of practices of defendants designed to terminate ongoing tenancies after they collectively occupied the role of landlord of this building. Although the issues were sharply disputed, there was evidence from which the jury could conclude that at the time defendants purchased the building it was in reasonable condition, supplying essential services to these tenants, many of whom had been fairly long-term residents. We recognize that defendants' contend they intended to rehabilitate the building which they considered to be in deplorable condition. Nonetheless, defendants conceded that their contractor,[8] for whatever reason, caused manifest destruction to the building and its facilities. Many of the tenants were deprived of the bare essentials of habitability such as water, heat and reasonable security. From the evidence the jury could conclude that defendants did this in an effort to induce plaintiffs to move, either to enable defendants to increase the rents under the Rent Control Ordinance or to convert the building to condominiums.[9]
While conversion of a building from the rental market to a condominium is legally permissible, strict procedures adopted by the Legislature must be followed. See N.J.S.A. 2A:18-61.7 et seq. In connection with that enactment, the Legislature found:

*467 a. Acute State and local shortages and high levels of demand for residential dwellings have motivated removal of blameless tenants in order to directly or indirectly profit from conversion to higher income rental or ownership interest residential use.
b. This has resulted in unfortunate attempts to displace tenants employing pretexts, stratagems, or means other than those provided pursuant to the intent of the State eviction laws designated to fairly balance and protect rights of tenants and landlords. [N.J.S.A. 2A:18-61.1a.(a) and (b).]
From the evidence presented in this case the jury could have concluded this was the intent of defendants.
It is argued that the Consumer Fraud Act should not apply because of the myriad of legislation[10] dealing with the landlord-tenant relationship. Initially, we note that N.J.S.A. 56:8-19 specifically provides that "in any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest." [Emphasis supplied.] Furthermore, the Consumer Fraud Act does not conflict with the various special statutes involving the landlord-tenant relationship as in those cases cited by the trial judge which hold that a statutory provision dealing with a particular subject prevails over a general statute on the same subject. We agree there should not be duplicative recoveries for the same ascertainable loss, see Neveroski v. Blair, 141 N.J. Super. 365, 382 (App.Div. 1976), but conclude that the existence of other statutory remedies for some of defendants' conduct does not bar applicability of the Consumer Fraud Act to this landlord-tenant relationship.
Furthermore, some of the plaintiffs were induced to move to other apartments in the building on the representation that they could return to their apartment when it was rehabilitated. *468 We recognize that because some of the apartments were rehabilitated an inference may exist that defendants did intend rehabilitation of the entire building. However, this was before the jury for their consideration. The landlord had a continuing obligation to provide water, heat and some security as basic requirements of habitability.[11] This they admittedly failed to do. Thus, the "subsequent performance" of these defendants was found by the jury to violate all of the provisions of the Consumer Fraud Act.
The simple answer to defendants' contention that the failure of the attorney general to adopt regulations addressed to the landlord-tenant relationship under the Consumer Fraud Act indicates a conclusion that the act does not apply to that relationship, is that the attorney general specifically intervened in this case for the sole and express purpose of arguing that the Consumer Fraud Act does apply to the landlord-tenant relationship. Furthermore, we agree with the attorney general that the cases of Daaleman v. Elizabethtown Gas Co., supra, and In re Cantanella and E.F. Hutton and Co. Inc. Securities Litigation, 583 F. Supp. 1388 (E.D.Pa. 1984) do not undercut the conclusion that the New Jersey Consumer Fraud Act as presently worded applies to the landlord-tenant relationship. Unlike "real estate," the term "securities" although proposed for inclusion, was never added to any section of the Consumer Fraud Act. Moreover, securities fraud is a subject which is regulated by the Division of Consumer Affairs, Bureau of Securities. These two cases involve matters subject to supervision and control by regulatory agencies with primary authority to address and resolve the subject matter of the litigation. See also Pierzga v. Ohio Cas. Group of Ins. Companies, 208 *469 N.J. Super. 40 (App.Div.), certif. den. 104 N.J. 399 (1986), involving the insurance industry. As noted by the attorney general, unlike the Board of Public Utilities in Daaleman and the Department of Insurance in Pierzga, there is no single administrative forum regulating all of the acts and practices in the landlord-tenant area, nor a single forum to provide relief.
We realize that a determination that the Consumer Fraud Act applies to the landlord-tenant relationship may increase trials and appeals in landlord-tenant dispossess cases and thus increase the burden of the judiciary. We reiterate the warning given by the Supreme Court in Marini v. Ireland, 56 N.J. 130, 147 (1970), that our determination does not constitute an invitation to obstruct the recovery of possession by a landlord legitimately entitled thereto. It was there suggested that if the trial of a matter is delayed the defendant should be required to deposit the full amount of unpaid rent in order to protect the landlord if he prevails. Furthermore, we underscore that the Consumer Fraud Act will only apply to extreme conduct of landlords sufficient to meet the condemned commercial practices set forth in N.J.S.A. 56:8-2.
We see no need to discuss decisions of other states cited by the parties which deal with the application of their consumer fraud statutes to landlord-tenant relationships since we are dealing with the express language contained in our statute.
The decision of the trial judge dismissing counts one and four of the complaint charging violations of the Consumer Fraud Act is reversed. Since the issue has been fully presented to the jury with appropriate instructions from the trial judge and the verdicts rendered by the jury molded into an advisory judgment, that judgment will be entered as a final judgment on this issue except as to the award of attorneys' fees which will be remanded for reconsideration by the trial judge.
N.J.S.A. 56:8-19 directs the court to award reasonable attorneys' fees. We note that a counsel fee of $52,676.25 was awarded to plaintiffs' attorney who is with the Essex County *470 Tenant Resource Center, with an additional fee of $24,500 awarded to another attorney. It is not clear whether the award is to the attorney or to the Essex County Tenant Resource Center and whether the attorneys are salaried employees of that organization. It is also not clear why attorneys' fees were awarded to two separate attorneys who appear to have represented all of the plaintiffs collectively and not to have represented separate plaintiffs.
The complaint contained eleven counts, nine of which ultimately went to the jury and verdicts were obtained by plaintiffs on several counts other than those for consumer fraud. Thus counsel's efforts were not limited to the consumer fraud claim, but were spread among several other claims upon which counsel were not entitled to attorneys' fees. This factor should be considered by the court in fixing counsel fees. See Simon v. Solomon, 385 Mass. 91, 431 N.E.2d 556, 570, (1982), where the Supreme Judicial Court of Massachusetts said: "A statutory fee award should not cover effort expended on independent claims that happen to be joined with statutory claims in a single proceeding." For a case involving counsel fees under the Massachusetts Consumer Fraud Act, see Hanner v. Classic Auto Body, Inc., 10 Mass. App. 121, 406 N.E.2d 686, 688 (1980). See also Brown v. City of Newark, 202 N.J. Super. 1, 10 (App.Div. 1985); Singer v. State, 95 N.J. 487, 500, cert. den. 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984); also see R. 4:42-9(b) as to affidavits of service.
We have not been provided with any information as to the factors considered by the trial judge in computing these fees. For example, as noted above, the inexperience of plaintiffs' counsel in the presentation of this case was a substantial factor in the inordinate length of this trial.[12] The trial judge shall *471 reconsider the amount of fees awarded and set forth the factors considered by him in fixing them. See RPC 1.5.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
In count nine of their complaint plaintiffs allege, as a separate tort, intentional infliction of emotional distress. This cause of action has been recognized in this jurisdiction based upon the tort of "outrage." See Hume v. Bayer, 178 N.J. Super. 310, 312 (Law Div. 1981); see also Hafner v. Hafner, 135 N.J. Super. 328, 333-334 (Law Div. 1975). The outlines of the cause of action are to be found in the Restatement, Torts (Second) § 46, which reads in pertinent part:
§ 46. Outrageous Conduct Causing Severe Emotional Distress
(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
As explained in Comment b in the Restatement:
As indicated in Chapter 47, emotional distress may be an element of damages in many cases where other interests have been invaded, and tort liability has arisen apart from the emotional distress. Because of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability, the law has been slow to afford independent protection to the interest in freedom from emotional distress standing alone. It is only within recent years that the rule stated in this Section has been fully recognized as a separate and distinct basis of tort liability, without the presence of the elements necessary to any other tort, such as assault, battery, false imprisonment, trespass to land or the like. This Section may be regarded as an extension of the principle involved in the rules stated in §§ 21-34 as to the tort of assault.
Comment d further explains the concept:
d. Extreme and Outrageous Conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another *472 tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arose his resentment against the actor, and lead him to exclaim, `Outrageous!'
The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
The doctrine was explained by the Third Circuit in Polito v. Continental Cas. Co., 689 F.2d 457, 464 (3rd Cir.1982), as follows:
New Jersey only recently recognized an independent cause of action for intentional infliction of emotional distress. Hume v. Bayer, 178 N.J. Super. 310, 314, 428 A.2d 966, 968 (Law Div. 1981). Prior to Hume v. Bayer, New Jersey drew a distinction between a separate cause of action for the tort and recovery for the harm as an element of damages in an action on another underlying tort. Compare Portee v. Jaffe, 84 N.J. 88, 417 A.2d 521 (1980) (emotional distress as an element of damages in either negligence or intentional tort actions); Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979) (same); Muniz v. United Hospitals Medical Center Presbyterian Hospital, 153 N.J. Super. 79, 379 A.2d 57 (App.Div. 1977) (same); with Schwartz v. United Jersey Bank, 497 F. Supp. 335, 337 (D.N.J. 1980) (no separate cause of action under New Jersey law); Hafner v. Hafner, 135 N.J. Super. 328, 334, 343 A.2d 166, 169 (Law Div. 1975) (same).
The dissent in Strachan v. John F. Kennedy Memorial Hosp., 209 N.J. Super. 300, 333-347 (App.Div. 1986), distinguished the claim for intentional infliction of emotional distress by a direct victim from the emotional distress suffered as damages by a bystander as in Portee v. Jaffe, 84 N.J. 88 (1980). But see Henderson v. Morristown Memorial Hospital, 198 N.J. Super. 418, 430-431 (App.Div. 1985). In its decision affirming in part and reversing in part our decision in Strachan v. John F. Kennedy Memorial Hosp., 109 N.J. 523 (1988), the Supreme Court cited Hume v. Bayer, supra at 536 without either embracing or disapproving the concept and ultimately concluded:
We need not decide today whether Portee's abandonment of the physical injury requirement for emotional distress claims should extend to all `direct' claims for emotional distress. We need look no further than the long recognized exception for negligent handling of a corpse. [109 N.J. at 538.]
Hume v. Bayer, supra, and Calliari v. Sugar, 180 N.J. Super. 423 (Ch.Div. 1980), are cited in an annotation collecting the cases *473 either recognizing or not recognizing the tort in various jurisdictions. See 38 A.L.R.4th 998, 1012 (1985).
Plaintiffs note that the cause of action has been applied to "evicting landlords seeking to harass unwanted tenants." See Prosser & Keaton's Law of Torts, § 12 (5th ed. 1984) at p. 62. Among the cases cited by the authors for that proposition is Emden v. Vitz, 88 Cal. App.2d 313, 198 P.2d 696 (D.Ct.App. 1948), where the court upheld a verdict in favor of a tenant who suffered extreme fright resulting in physical injuries when her landlord told her she could no longer have an apartment. In a New York case cited by the authors, the court denied a landlord's motion to dismiss counterclaims filed against him by his tenants, seeking compensatory and punitive damages for the landlord's conduct in allegedly harassing tenants so they would either move or consent to a rent increase. See Scheman v. Schlein, 35 Misc.2d 581, 231 N.Y.S.2d 548 (S.Ct. 1962).
The Commonwealth of Massachusetts has firmly established a cause of action for intentional infliction of emotional distress as a separate tort.[13] In Simon v. Solomon, supra, 385 Mass. 91, 431 N.E.2d 556, in a case containing allegations similar to the allegations contained in this case, the court listed four elements necessary to a recovery on this theory taken from the Restatement:

*474 The plaintiff must show (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct ...; (2) that the conduct was `extreme and outrageous'; (3) that the actions of the defendant were the cause of the plaintiff's distress ...; and (4) that the emotional distress sustained by the plaintiff was severe. [Citation omitted.] If each of these elements is proven, the plaintiff can recover for purely emotional suffering unaccompanied by physical injury. [431 N.E.2d at 561.]
Essentially, the trial judge applied those elements in the interrogatories submitted to the jury, except he substituted for the statement "that he knew or should have known that emotional distress was the likely result of his conduct" the language that "the action or conduct evidence[d] a reckless disregard of the fact that severe emotional distress was probable considering the nature of the conduct."[14] Although our Supreme Court did not embrace the concept in Strachan v. John F. Kennedy Memorial Hospital, supra, it clearly did not disapprove it in citing Hume v. Bayer. We therefore conclude that a direct action for intentional infliction of emotional distress as a separate tort may be brought in the State of New Jersey in which the plaintiff must prove (1) that the actor intended to inflict emotional distress on the plaintiff or acted in reckless disregard of a high degree of probability that severe emotional distress will follow; (2) that the conduct was extreme and outrageous; (3) that the actions of defendant were the cause of plaintiff's emotional distress, and (4) that the emotional distress which was sustained by plaintiff was severe and not idiosyncratic.
In his charge to the jury on this count of the complaint, the trial judge said:
Each of the plaintiffs is also bringing an action based on intentional infliction of emotional distress allegedly caused by one or more of the defendants.
In order for any of the plaintiffs to recover based upon this cause of action, he or she must prove that the conduct of one or more of the defendants was so extreme and outrageous as to produce severe emotional distress. The conduct complained of must be so extreme and outrageous as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community.

*475 If you find that one or more of the defendant's conduct was extreme and outrageous, you must next determine whether or not the action evidenced either an intent to inflict severe emotional distress or a reckless disregard of the fact that such distress was probable considering the nature of the conduct.
If you find that the conduct was both extreme and outrageous and done with either an intent to inflict severe emotional distress or a reckless disregard that such distress was probable, you must consider whether the plaintiffs suffered severe emotional distress. In order for any of the plaintiffs to prove severe emotional distress by a preponderance or greater weight of the available evidence is not necessary for him or her to have sustained substantial bodily injury. Nevertheless, the emotional injury allegedly suffered must be severe and of the kind that would affect a normally constituted person. A severe emotional distress is intended to mean that a person's response might not be idiosyncratic but reasonable [sic] to be anticipated in a normal person.
From the interrogatories answered by the jury,[15] they concluded that the conduct of the three defendants was extreme and outrageous, but that it did not evidence an intent to inflict severe emotional distress, but rather a reckless disregard of the fact that severe emotional distress was probable considering the nature of the conduct.
We conclude that the circumstances in this case were sufficient to support a claim for intentional infliction of emotional distress. The jury was correctly instructed as to the nature of the conduct necessary to find defendants liable to plaintiffs. There is no reason why this cause of action should not exist between tenants and their landlord when the conduct of the landlord is sufficiently outrageous to support the claim. In this case, the jury has made that finding. We therefore conclude the claim was properly submitted to the jury who found in favor of plaintiffs on liability. We affirm the verdict in favor of plaintiffs on the claim of intentional infliction of emotional distress on liability and turn now to the question of damages.

DAMAGES
The jury awarded compensatory damages to five of the *476 plaintiffs for their severe emotional distress.[16] As to the other six plaintiffs, when the jury originally returned its verdict, in answer to the question "What amount of money would compensate the plaintiff for the severe emotional distress suffered?" the jury answered, "0." Peculiarly as to those plaintiffs, the jury awarded punitive damages.[17] Although plaintiffs' counsel requested the court to "mold" the jury's verdict on compensatory damages from zero to $1, the trial judge decided he should ask the jury whether they intended by their verdict of no compensatory damages to mean nominal damages.
In Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37 (1984), the Supreme Court explained damages:
The three basic types of legal damages are compensatory, nominal, and punitive. Compensatory damages are designed to compensate a plaintiff for an actual injury or loss. Nominal damages, unlike compensatory damages, do not attempt to compensate a plaintiff for an actual loss. D. Dobbs, Handbook on the Law of Remedies, § 3.1, at 135, and § 3.8, at 191 (1973). Rather, they are a trivial amount `awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one dependent upon loss or damage * * *. The award of nominal damages is made as a judicial declaration that the plaintiff's right has been violated.' C. McCormick, supra, § 20, at 85. Finally, punitive damages are awarded as punishment or deterrence for particularly egregious conduct. Leimgruber v. Claridge Assocs., 73 N.J. 450, 454 (1977); DiGiovanni v. Pessel, 55 N.J. 188, 190 (1970).
In his original charge to the jury, the trial judge explained the three types of damages essentially in accordance with the teaching of Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra. In deciding to supplement his instruction on damages, the trial judge said:

*477 It is this court's considered opinion that in charging the jury it did not specifically point out to the members of the jury two things that I think are very vital:
One, that by nominal damages, I should have given an example. The examples that we know of in law school are Peppercorn (ph). I will not utilize that, that's too confusing in this day and age. I will use five cents or one dollar.
When the jury returned a second time they awarded $1 compensatory damages to each of those plaintiffs who received awards of punitive damages. Defendants assert this procedure was improper because the trial judge had fully instructed the jury originally as to the concept of nominal damages and thus the jury's verdict was fatally flawed. We disagree. Although the jury had returned with their verdict, they had not been discharged. The judge simply sought clarification from them as to a portion of their verdict. See, e.g., State v. Fungone, 134 N.J. Super. 531, 536 (App.Div. 1975), certif. den. 70 N.J. 526 (1976), where in a criminal case we quoted the following from a Virginia case:
While the jury are in the actual presence of the court and under its control, it can see, without resort to testimony, that the fountain of justice has been kept pure, and that no harm could have come to the accused.
See also R. 4:39-2. Where answers to interrogatories are inconsistent with a general verdict the court may return the jury for further consideration. Since the jurors had not been discharged and were still within the control of the court,[18] we see no error in eliciting from them what they intended with respect to the award of compensatory or nominal damages.
Compensatory damages are not an essential element of an intentional tort committed willfully and without justification *478 where there is some loss, detriment or injury and nominal damages may be awarded in such cases in the absence of compensatory damages. See Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra, 97 N.J. at 48.
The trial judge asked the jury to complete a supplemental set of interrogatories for each plaintiff setting forth nine categories of compensatory damages to assist the court in understanding the jury's verdict. See Appendix A(8). Our analysis of the jury's verdict, from the original and supplemental interrogatories as molded into the final judgment entered, exclusive of the consumer fraud claim, reveals that the compensatory damages awarded do not appear to overlap. Yet, when compared with the factors included in the ascertainable loss found under the consumer fraud claim there may be some overlapping and inconsistency.[19] We recognize that N.J.S.A. 56:8-2.13 enacted by P.L. 1979, c. 347 as a supplement to the Consumer Fraud Act dealing with eating establishments provides:
The rights, remedies and prohibitions accorded by the provisions of this act are hereby declared to be in addition to and cumulative of any other right, remedy or prohibition accorded by the common law or statutes of this State, and nothing contained herein shall be construed to deny, abrogate or impair any such common law or statutory right, remedy or prohibition.
However, we conclude that the language of this enactment and the phrase, "in addition to any other appropriate legal or equitable relief" in N.J.S.A. 56:8-19 were not intended to sanction duplicative damages for the same economic loss. See Neveroski v. Blair, supra, 141 N.J. Super. at 382. However, there may be duplicate remedies for the same conduct. See Dreier Co., Inc. v. Unitronix Corp., 218 N.J. Super. 260, 272 (App.Div. 1986).
The jury found, in connection with the breach of the warranty of habitability, that defendant's conduct, although not negligent *479 under count seven, was intentional and/or willful and wanton under count eight, entitling plaintiffs to an award of compensatory damages (with the exception of plaintiff Smith). However, on that claim the jurors did not award punitive damages.
Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's conduct is especially egregious. They are awarded upon a theory of punishment to the offender for aggravated misconduct and to deter such conduct in the future. Leimgruber v. Claridge Associates Ltd., 73 N.J. 450, 454 (1977). The decision to award exemplary [punitive] damages and the amount thereof rests within the sound discretion of the trier of fact. In assessing such damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence, including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, the wealth of the perpetrator, as well as any mitigating circumstances which may operate to reduce the amount of the damage. Id. at 456. Plaintiffs may not recover punitive damages by recasting merely negligent conduct as willful and wanton. Edwards v. Our Lady of Lourdes Hosp., 217 N.J. Super. 448, 460-461 (App.Div. 1987), citing Entwhistle v. Draves, 102 N.J. 559, 562 (1986). To warrant punitive damages the conduct must consist of "intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." Nappe v. Anschelewitz, Barr, Ansell & Bonello, supra, 97 N.J. at 49. There must have been a "positive element of conscious wrongdoing." Berg v. Reaction Motors Div., 37 N.J. 396, 414 (1962).
The jury's verdicts as to punitive damages are inconsistent in several respects. Initially we note that on the claim for intentional and/or willful conduct charged in count eight of the complaint, the jury was asked:

*480 5. Do you find that the conduct of the defendant or defendants referred to in Answers # 1 and # 2 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
to which the jurors answered "no." Yet, in the interrogatory submitted in connection with the claim for intentional infliction of emotional distress as charged in count nine, the jury was asked:
6. Do you find that the conduct of the defendant or defendants referred to in Answer # 1 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
to which the jurors answered "yes" in the case of plaintiffs Curry, Benjamin, Victor Herrera, Marleni Herrera, Edwin Simon and Brodie, and "no" as to the others. We recognize that the interrogatory involving intentional and/or willful and wanton conduct referred to the jury's finding as to whether that conduct was intentional or was in wanton and willful disregard of the rights of plaintiffs, whereas the interrogatory on intentional infliction of emotional distress simply asked whether the conduct was extreme or outrageous. Nevertheless, the questions are essentially the same and both relate to the same conduct by defendants. It is difficult to reconcile the different answers by the jury.
Six of the plaintiffs received awards of punitive damages. In addition, plaintiff Curry received an award of $2,250 as punitive damages on her claim of common law fraud. In each instance only nominal damages were awarded. As noted, those plaintiffs who were awarded compensatory damages for intentional infliction of emotional distress did not receive any award for punitive damages. We are unable to ascertain whether those compensatory damages were truly "compensatory" or intended as lesser amounts of punitive damages. The award of punitive damages to those who were awarded only nominal damages and no award of punitive damages to those who received compensatory damages for the emotional stress suffered by them seems inconsistent. As defendants argue, all of the claims arise out of the same conduct by defendants. The awards of damages *481 should fall into various categories based upon the several causes of action alleged.
Some courts have adopted a requirement that the punitive damage award must represent some proportional relationship to the amount of compensatory or actual damages awarded. This requirement is known as the reasonable proportion or "ratio" rule. Leimgruber, supra, 73 N.J. at 457. One major objection to the "ratio" rule is that it collides with the rationale for imposing punitive damages which are awarded, as noted, on a theory of punishment and deterrence; the amount fixed should vary with the wrongdoer's financial circumstances so that very wealthy offenders would be charged with higher damages. Id. at 458.[20] If a fact-finder decides to award punitive damages, additional considerations can guide a determination of the appropriate amount. Punitive damages should bear some reasonable relationship to actual injury, but the Supreme Court has consistently declined to require a set numerical ratio between punitive and compensatory damages. See Fischer v. Johns-Manville Corp., 103 N.J. 643, 673 (1986). The reasonableness of the relationship of punitive damages to actual injury must be considered in light of other factors in each case. For example, some particularly egregious conduct may generate only minimal compensatory damages. In such case higher punitive damages would be justified than when substantial compensatory damages are awarded.
Applying these principles and because of the various inconsistencies noted, we set aside the punitive damages awarded in this case with the exception of the punitive damage award of $2,500 to plaintiff Curry on the common law fraud count which we affirm. Furthermore, in light of our decision that the Consumer Fraud Act applies to defendants' conduct in this case, the ascertainable loss of monies or property suffered by *482 them has been trebled and represents a punitive recovery. See Neveroski v. Blair, supra, 141 N.J. Super. at 382. In our view, any punitive damages awarded should be reduced to the extent of the trebled portion, i.e., two-thirds of the ascertainable compensatory loss suffered by the plaintiffs. Since recovery on the various counts is based upon the same conduct by the defendants, there should be no double recoveries for economic loss. Lastly, although there is no fixed numerical ratio between punitive and compensatory damages, it is difficult to divine the disparity between the amounts of punitive damages awarded as between the various plaintiffs and the failure to award any punitive damages to plaintiffs who were found to have suffered a compensatory loss for the severe emotional distress inflicted upon them.
The advisory judgment in favor of plaintiffs and against defendants under the Consumer Fraud Act shall be entered as a final judgment except as to attorneys' fees. In addition, the compensatory damages awarded to the various plaintiffs in the original final judgment, much of which have already been paid to plaintiffs, is affirmed, unless on remand the trial judge determines that there are duplicative recoveries for the ascertainable loss under the Consumer Fraud Act and a compensatory award under one of the other counts. The verdict of the jury in favor of plaintiffs for intentional infliction of emotional distress is affirmed as to liability, but reversed and remanded as to both compensatory and punitive damages. The punitive damages of $2,500 awarded to plaintiff Curry on her claim of common law fraud alleged in count two of the complaint upon which nominal damages were awarded is affirmed.[21] The matter is remanded to the trial judge to sort out any duplicative *483 recoveries and for retrial as to damages, both compensatory and punitive on the claim of intentional infliction of emotional distress. We recognize that the trial judge probably analyzed the jury's verdict in reaching his decision denying both parties' motions for judgment notwithstanding the verdict or in the alternative for a new trial. However, neither party saw fit to provide us with a transcript of that opinion. Accordingly, we leave it to the trial judge to determine whether there are any duplicative recoveries. We do not retain jurisdiction.

APPENDIX A(1)
JURY INTERROGATORIES  CONSUMER FRAUD ACT
For Plaintiff Lucinda Curry.
1. Do you find that one or more of the defendants used or employed any unconscionable commercial practices regarding this plaintiff as a tenant?
 Yes &check; 
 No ____
If "yes" indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
2. Do you find one or more of the defendants used or employed any acts of deception regarding this plaintiff as a tenant?
 Yes &check; 
 No ____
If "yes" indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
3. Do you find one or more of the defendants used or employed any acts of fraud regarding this plaintiff as a tenant?
 Yes &check; 
 No ____

*484 If "yes", indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
4. Do you find one or more of the defendants used or employed any acts of false pretense regarding this plaintiff as a tenant?
 Yes &check; 
 No ____
If "yes", indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
5. Do you find one or more of the defendants used or employed any acts involving a false promise regarding this plaintiff as a tenant?
 Yes &check; 
 No ____
If "yes", indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
6. Do you find one or more of the defendants used or employed any acts involving misrepresentation regarding this plaintiff as a tenant?
 Yes &check; 
 No ____
If "yes", indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
7. Do you find that one or more of the defendants knowingly concealed, suppressed or omitted a material fact from the plaintiff regarding this plaintiff's tenancy?
 Yes &check; 
 No ____

*485 If "yes" indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
8. Do you find that one or more of the defendants acted with the intent that the plaintiff rely upon such concealment, suppression or omission?
 Yes &check; 
 No ____
If "yes" indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
If you have answered "yes" to any of the question listed in numbers 1 through 6, or have answered "yes" to number 8, then proceed to question 9.
9. Do you find that the plaintiff suffered any ascertainable loss of money or property as a result of the practices, acts and/or omissions of the defendant or defendants which you have checked off in the preceding questions?
 Yes &check; Go on to #10
 No ____ This is your last question
10. What is the amount of ascertainable loss of money or property which this plaintiff has suffered?
 $ 1000 
11. In answering question #10, which of the following factors were determined by you to have caused this plaintiff's losses? (Check off all that apply).
 (a) Increased electric and gas bills .......... &check; 
 (b) Loss of personal property ................. &check; 
 (c) Reduction in rental value of plaintiff's
 apartment compared to the amount of rent
 paid (per month) .......................... &check; 
 (d) Other loss of money or property ........... ____
 (Specify)
 ___________________________________________
 (e) Injury to person .......................... ____
 (Specify)
 __________________________________________
 __________________________________________

*486 APPENDIX A(2)
JURY INTERROGATORIES  COMMON LAW FRAUD
For Plaintiff Lucinda Curry .
1. (a) Do you find that one or more of the defendants made a representation of fact to this plaintiff?
 Yes &check; 
 No ____
If "yes" indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
(b) Do you find that a representation was made by one or more of the defendants which omitted or only partially disclosed a material fact?
 Yes &check; 
 No ____
If "yes" indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
2. (a) Do you find such representation of fact was false?
 Yes &check; 
 No ____
(b) Do you find such omission or partial disclosure made the representation false?
 Yes &check; 
 No ____
3. (a) Do you find that the defendant or defendants knew the statement was false and made the representation with intent to deceive?
 Yes &check; 
 No ____
(b) Do you find that the defendant or defendants believed the statement was false and made the representation with intent to deceive?
 Yes &check; 
 No ____
*487 4. Do you find with respect to any omission or partial disclosure that same was made with intent to deceive?
 Yes &check; 
 No ____
5. (a) Do you find that this plaintiff justifiably relied and/or believed on such false representation of fact?
 Yes &check; 
 No ____
(b) Do you find that this plaintiff justifiably believed and/or relied on the omission and/or partial disclosure?
 Yes &check; Go on to #6
 No ____
6. Do you find that as a result of her reliance upon the representation or partial disclosure or omission the plaintiff sustained damages?
 Yes &check; 
 No ____
7. Do you find that this plaintiff sustained damages attributable to the conduct referred to in questions #1 through # 5?
 Yes &check; 
 No ____
If "yes" indicate the amount of damages.
 COMPENSATORY OR NOMINAL $ ____
8. Do you find that the conduct of the defendant or defendants referred to in Answer #1 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
 Yes &check; 
 No ____ Stop. You
 have completed
 this
 section.
If "yes", indicate as to which defendant or defendants and indicate the amount which would punish such defendant or defendants and deter such conduct in the future.
 Sheva Gardens, Inc. &check; $ 750 
 Bat-Sheva Halperin &check; $ 1000 
 Natalie Development
 Corp. &check; $ 500 

*488 APPENDIX A(3)
JURY INTERROGATORIES  NEGLIGENT MISREPRESENTATION
For Plaintiff, Lucinda Curry .
1. Do you find that one or more of the defendants made a false or erroneous statement to the plaintiffs?
 Yes &check; Go on to #2.
 No ____ Stop. You have finished
 this questionnaire
 section.
If "yes" make an appropriate marking as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development Corp. &check; 
2. Do you find that in making such false or erroneous statement, the defendant or defendants acted unreasonably or did not exercise the degree of care required under the circumstances?
 Yes &check; Go on to #3.
 No ____ Stop. You have finished
 this questionnaire section.
3. Do you find that the plaintiff justifiably relied upon the representation referred to in question #1?
 Yes &check; Go on to #4.
 No ____ Stop. You have finished
 this questionnaire section.
4. Do you find that the plaintiff has sustained damages as a direct result of justifiably relying upon the false or erroneous representation?
 Yes &check; Go on to #5.
 No ____ Stop. This section
 is completed.
5. List the amount of damages attributed to the conduct referred to in #1 and #2 above.
 COMPENSATORY $ 200 

*489 APPENDIX A(4)
JURY INTERROGATORIES  BREACH OF WARRANTY OF HABITABILITY  COUNT VI
For Plaintiff Lucinda Curry .
1. Do you find that the defective conditions existed in the plaintiff's apartment and/or common areas rendering the premises uninhabitable to a reasonable person?
 Yes &check; Go on to #2.
 No ____ Stop. You have
 completed this section.
2. Do you find that the plaintiff gave one or more of the defendant's notice of the alleged defect or defects?
 Yes &check; 
 No ____
If "yes", indicate as to which defendant or defendants and go on to #3.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development Corp. &check; 
If "no", stop. You have completed this questionnaire section.
3. Do you find that the plaintiff requested that the landlord correct such defects or conditions?
 Yes &check; Go on to #4.
 No ____ Stop. You have
 completed this section.
4. Do you find that the plaintiff-tenant allowed the landlord a reasonable time to correct the defect or defects after the landlord acquired knowledge of it?
 Yes &check; Go on to #5.
 No ____ Stop. You have
 completed this section.
5. List the amount of time in months for which you find the plaintiff's premises and/or common areas existed in a defective condition.
 14 months.
(a) Indicate the date which you find represents when the defective condition or conditions arose in the plaintiff's premises.
 June '84 

*490 (b) Indicate the date which you find represents when the plaintiff requested the landlord to correct such defective conditions.
 Sept. '84 
(c) Indicate the date which you find represents when the defective condition or conditions no longer existed.
 N/A P moved 
6. What is the percentage of rent which you find should be utilized in reducing the amount of rent charged for rental value of the premises during its imperfect condition?
 8 %
7. For what months do you find the plaintiff paid rent?
 8 months.

APPENDIX A(5)
JURY INTERROGATORIES  NEGLIGENCE
FOR PLAINTIFF Lucinda Curry.
1. Do you find that one or more of the defendants failed to exercise reasonable care in maintaining and repairing those facilities and equipment under its control?
 Yes &check; 
 No ____
If "yes", make an appropriate marking indicating as to which defendant or defendants.
 Sheva Gardens &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development &check; 
(a) Do you find that one or more of the defendants failed to furnish reasonable safeguards to provide adequate security?
 Yes &check; 
 No ____
If "yes", make an appropriate marking indicating as to which defendant or defendants.
 Sheva Gardens ____
 Bat-Sheva Halperin ____
 Natalie Development ____
(b) Do you find that one or more of the defendants failed to exercise reasonable care in maintaining the passageways, stairways or other portions of the premises used in common by the tenants reasonably fit for the tenant's use?
 Yes &check; 
 No ____

*491 (c) Do you find that one or more of the defendants failed to inform the plaintiff of any hidden defect involving an unreasonable risk of bodily harm which the landlord knew existed, of which he had reason to believe the tenant would not discover and of which the tenant was unaware?
 Yes ____
 No &check; 
If "yes", indicate by an appropriate marking as to which defendant or defendants.
 Sheva Gardens ____
 Bat-Sheva Halperin ____
 Natalie Development ____
If "no" to parts (a), (b) and (c) then Stop, you have completed this section.
2. Do you find that one or more of the defendants either had knowledge of the unsafe conditions or by exercising reasonable care in inspecting the premises could have discovered the unsafe or dangerous conditions?
 Yes &check; 
 No ____
3. If you have answered "yes" to question #1 or any of its subparts, do you find that such failure to exercise reasonable care was a proximate cause of this plaintiff's injury?
 Yes ____
 No &check; Stop. You have
 completed the
 questionnaire
 section.

APPENDIX A(6)
JURY INTERROGATORIES  INTENTIONAL AND/OR WILLFUL AND WANTON CONDUCT
For Plaintiff, Lucinda Curry .
1. Do you find that one or more of the defendants acted in a way such as to intentionally cause harm to this plaintiff?
 Yes ____
 No &check; 
If "yes", indicate as to which defendant or defendants.
 Sheva Gardens, Inc. ____
 Bat-Sheva Halperin ____
 Natalie Development Corp. ____
2. Do you find that one or more of the defendants acted with wanton and willful disregard of the rights of plaintiff or failed to act with regard to the rights of plaintiff?
 Yes ____
 No &check; 

*492 If "yes", indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development Corp. &check; 
3. Do you find that the plaintiff has sustained injury or damage attributable to the conduct referred to in #1 and/or #2 above?
 Yes &check; 
 No ____
4. List the amount of damages attributed to the conduct referred to in #1 and/or #2 above.
 COMPENSATORY OR NOMINAL $ 200 
5. Do you find that the conduct of the defendant or defendants referred to in Answers #1 and #2 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
 Yes ____
 No &check; Stop. You have
 completed this section.
If "yes", indicate as to which defendant or defendants and indicate the amount which would punish such defendant or defendants and deter such conduct in the future.
 Sheva Gardens, Inc. ____ $ ____
 Bat-Sheva Halperin ____ $ ____
 Natalie Development Corp. ____ $ ____
APPENDIX A(7)
JURY INTERROGATORIES  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
For Plaintiff, Lucinda Curry .
1. Do you find that the actions or conduct of one or more of the defendants was extreme and outrageous?
 Yes &check; 
 No ____ Stop. You have
 completed this section.
If "yes" indicate as to which defendant or defendants.
 Sheva Gardens, Inc. &check; 
 Bat-Sheva Halperin &check; 
 Natalie Development Corp. &check; 
*493 2. Did the action or conduct evidence an intent to inflict severe emotional distress?
 Yes ____ Go on to #4
 No &check; Go on to #3
3. Did the action or conduct evidence a reckless disregard of the fact that severe emotional distress was probable considering the nature of the conduct?
 Yes &check; Go on to #4
 No ____ Stop you have completed
 this section.
4. Do you find that the plaintiff suffered severe emotional distress attributed to the defendant's conduct?
 Yes &check; Go on to #5
 No ____ Stop. You have
 completed this section.
5. What amount of money would compensate the plaintiff for the severe emotional distress suffered?
 COMPENSATORY OR NOMINAL $ 0 
6. Do you find that the conduct of the defendant or defendants referred to in Answer #1 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
 Yes &check; 
 No ____ Stop. You have
 completed this section.
If "yes", indicate as to which defendant or defendants and indicate the amount which would punish such defendant or defendants and deter such conduct in the future.
 Sheva Gardens, Inc. ____ $ 7,500 
 Bat-Sheva Halperin ____ $ 10,000 
 Natalie Development Corp. ____ $ 7,500 

*494 APPENDIX A(8)
JURY INTERROGATORY
FOR PLAINTIFF LUCINDA CURRY
 1. Total increased electric and gas bills $ 375 
 2. Total loss of personal property $ 225 
 3. Total reduction in rental value of apartment $ 400 
 4. Total other loss of money or personal property
 not already set forth $ 200 
 5. Total other debts incurred not already set forth $ 0 
 6. Total pain and suffering $ 200 
 7. Total severe emotional distress $ 0 
 8. Total pain and suffering and severe emotional
 distress (#6 plus #7) $ 200 
 9. Total other (Specify) $ 0 
 ___________________________
 ___________________________
 ___________________________
 ___________________________

*495 APPENDIX B

 ANSWERS TO INTERROGATORIES
 COUNT 1 COUNT 5 COUNT 6
 COMMON LAW NEGLIGENT BREACH OF WARRANTY
 FRAUD MISREPRESENTATION OF HABITABILITY
 TIME OF
 DEFECTIVE REDUCTION
 COMP. PUNITIVE CONDITION IN RENT
 ------------------------------------------------------------
 CURRY $1. $2,250. $200. 14 mos. 8%
 BENJAMIN - - 500. 18 mos. 8%
 V. HERRERA - - 200. 18 mos. 8%
 M. HERRERA No Cause No Cause 18 mos. 8%
 B. BRANCH - - 200. 18 mos. 8%
 E. SIMON No Cause No Cause 17 mos. 8%
 B. SIMON - - No Cause 18 mos. 8%
 FAIRCLOTH - - No Damage 18 mos. 8%
 ASHE - - No Cause 18 mos. 8%
 BRODIE - - 200. 18 mos. 8%
 SMITH - - No Cause No Cause
 COUNT 7 COUNT 8 COUNT 9
 NEGLIGENCE INTENTIONAL AND/OR INTENTIONAL
 WILLFUL AND WANTON INFLICTION OF
 CONDUCT EMOTIONAL
 PAID DISTRESS
 RENT COMP. PUNITIVE COMP. PUNITIVE
 -----------------------------------------------------------
 CURRY 8 mos. No Prom. $ 200. No $ 1. $25,000.
 Cause
 BENJAMIN 5 mos. No Prom. 1,000. No 1. 35,000.
 Cause
 V. HERRERA 10 mos. No Prom. 200. No 1. 10,000.
 Cause
 M. HERRERA 10 mos. No Damages 500. No 1. 20,000.
 B. BRANCH 9 mos. No Prom. 100. No 1,800. No
 Cause
 E. SIMON 8 mos. No Prom. 300. No 1. 15,000.
 Cause
 B. SIMON 8 mos. No Prom. 100. No 2,000. No
 Cause
 FAIRCLOTH 9 mos. No Prom. 100. No 1,800. No
 Cause
 ASHE 18 mos. No Prom. 200. No 2,000. No
 Cause
 BRODIE 9 mos. No Prom. 100. No 1. 16,000.
 Cause
 SMITH No Prom. No Damage No 1,800. No
 Cause
 FINAL JUDGMENT
 COMP. PREJUDGMENT RENT TOTAL
 DAMAGES INTEREST ABATEMENT SHEVA
 GARDENS
 -------------------------------------------------------------
 CURRY 402. 35.60 96. 533.69 8,250.
 BENJAMIN 1,501. 133.24 22.48 1,656.72 7,500.
 V. HERRERA 401. 35.60 175.20 611.80 2,500.
 M. HERRERA 501. 44.47 - 545.47 5,000.
 B. BRANCH 2,100. 186.41 107.60 2,394.01
 E. SIMON 301. 26.72 106.56 434.28 2,500.
 B. SIMON 2,100. 186.41 92.80 2,379.21
 FAIRCLOTH 1,900. 168.65 116.80 2,185.45
 ASHE 2,200. 195.28 99.36 2,494.64
 BRODIE 301. 26.72 95.76 423.48 2,500.[*]
 SMITH 1,800. 157.78 1,957.78
 PUNITIVE DAMAGE
 BAT NATALIE TOTAL
 SHEVA DEVELOP. PUNITIVE
 -------------------------------
 CURRY 11,000. 8,000. $27,250.
 BENJAMIN 20,000. 7,500. 35,000.
 V. HERRERA 5,000. 2,500. 10,000.
 M. HERRERA 10,000. 5,000. 20,000.
 B. BRANCH
 E. SIMON 10,000. 2,500. 15,000.
 B. SIMON
 FAIRCLOTH
 ASHE
 BRODIE 10,000. 2,500. 15,000.
 SMITH

*496 APPENDIX C

CONSUMER FRAUD ACT

Counts 1 and 4

 INTERROGATORIES ADVISORY JUDGMENT
 11(a) 11(b) 11(c) 11(d) 11(e)
 Increased Loss of Reduction Other Injury Verdict Trebled
 Gas and Personal in Rental Loss of to
 Electric Property Value of Money or Person
 PLAINTIFF Bills Apartment Property
 ----------------------------------------------------------------------------
 CURRY $375. $225. $400. - - $1,000. $3,000.
 BENJAMIN 220. 330. 500. - - 1,050. 3,150.
 V. HERRERA 900. - 500. - - 1,400. 4,200.
 M. HERRERA - - - - - NONE -
 B. BRANCH 150. - 500. - - 650. 1,950.
 E. SIMON 380. 550. 500. - - 1,500.[*] 4,500.
 B. SIMON 500. 50. 500. - - 1,050. 3,150.
 FAIRCLOTH 470. 100. 500. - - 1,070. 3,210.
 ASHE - 330. 400. - - 730. 2,190.
 BRODIE 600. - 400. - - 1,000. 3,000.
 SMITH 250. - 350. - - 600. 1,800.

NOTES
[1] The order of December 4, 1985 also dismissed the tenth and eleventh counts for failure to exhaust administrative remedies. Plaintiffs did not appeal from that ruling. The order also denied defendants' motion to dismiss the third and sixth counts and to strike plaintiffs' jury demand, except as to the third and sixth counts which the judge ruled were to be tried without a jury.
[2] Both orders refer to an oral opinion rendered on February 14, 1986 denying the motion, but neither party has provided us with a copy of the transcript of that oral opinion.
[3] Warrants for satisfaction of judgment were issued on December 12, 1986 in favor of defendants Natalie and Sheva only, and on January 8, 1987 as to defendant Bat Sheva Halperin. Neither side argues that payment of the judgment and execution of the warrants for satisfaction during the pendency of these appeals has rendered the issues moot. See Annot. "Defeated party's payment or satisfaction of, or other compliance with, civil judgment as barring his right to appeal," 39 A.L.R.2d 153 (1955). See also Beronio v. Pension Commission of Hoboken, 130 N.J.L. 620 (E. & A. 1943), and Reitano v. Yankwich, 38 Cal.2d 1, 237 P.2d 6 (1951). The parties did not enter into an agreement to waive their right of appeal. See Sturdivant v. General Brass & Machine Corp., 115 N.J. Super. 224, 227-228 (App.Div. 1971). A party has a right to accept a sum to which he is in any event entitled and still pursue his request for a legal ruling on appeal which would increase the sum. See Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 242 (1958).
[4] See Appendix A(1), interrogatories on the consumer fraud claim.
[5] Although there were separate interrogatories for Victor and Marleni Herrera, the jury answered the interrogatory as to Victor that he had sustained ascertainable loss in the amount of $1,400, but in the interrogatory as to Marleni that she had not suffered ascertainable loss.
[6] See Appendix A(8), reflecting the jury's verdict as to each factor included in each plaintiff's ascertainable loss, and Appendix C, the total advisory judgment.
[7] We are unable to determine why this reduction in the rental value of her apartment is different than the amount of rent abatement which she received for breach of the warranty of habitability.
[8] The defendants did not file a third-party action against the contractor Shawn.
[9] The chief financial officer of Natalie and vice president of Sheva testified that condominium conversion was discussed in meetings of officers of Natalie.
[10] See Anti-Eviction Act, N.J.S.A. 2A:18-61.1 et seq.; Senior Citizens and Disabled Protected Tenancy Act, N.J.S.A. 2A:18-61.22 et seq.; Landlord-Tenant Reprisal Law, N.J.S.A. 2A:42-10.10; Safe and Sanitary Housing for Tenants of Substandard Dwellings, N.J.S.A. 2A:42-85; Landlord-Tenant Registration Act, N.J.S.A. 46:8-27 et seq; Security Deposit Act, N.J.S.A. 46:8-19; Truth in Renting Act, N.J.S.A. 46:8-43 et seq. Some of these provisions call for treble damages plus attorneys' fees and costs. See N.J.S.A. 2A:18-61.6c and N.J.S.A. 2A:39-1 et seq., concerning self-help evictions.
[11] Although it is not altogether clear, the evidence suggests that the tenants went on a "rent strike" and some or all of them did not pay any rent from approximately November 1984 until their ultimate dispossession from the building on August 9, 1986. Shortly after defendants purchased the building several complaints were filed seeking possession for nonpayment of rent against several of the plaintiffs, but were not pursued.
[12] The attorney told the trial judge it was her first trial. The trial lasted from December 11, 1985 through January 21, 1986. In expressing his appreciation to the jury on January 24, 1986, we note that the trial judge said, "This case started for you folks on December 11, this case you were told at that time would be over on the Friday before Christmas. It's now January 24th."
[13] However, in one of the cases cited by plaintiffs for the proposition, Leardi v. Brown, 394 Mass. 151, 474 N.E.2d 1094 (1985), in which tenants sued their landlord for violation of that state's Consumer Protection Act, and one tenant included a claim for intentional infliction of emotional distress, the court said:

Allisan also contends that the trial judge erred in denying her claim for damages based on the theory of intentional infliction of emotional distress. The judge concluded that the landlord's agent `was playing hardball,' and that `the plaintiff did suffer distress as a result of the defendants' actions.' Nonetheless, he found for the defendants on the ground that the conduct was not `beyond all possible bounds of decency' or `utterly intolerable in the civilized community.' Agis v. Howard Johnson Co., 371 Mass. 140, 145, 355 N.E.2d 315 (1976), quoting Restatement (Second) of Torts § 46, comment d (1965). These findings, on this record, were not clearly erroneous. [474 N.E.2d at 1106.]
[14] See Appendix A(7), interrogatory # 3.
[15] Appendix A(7).
[16] Beryl Simon and Shirley Ashe received $2,000. Doris Faircloth, Joseph Smith and Beverly Branch each received $1,800. No punitive damages were awarded to those plaintiffs.
[17] Lucinda Curry was awarded $25,000, Colinwood Benjamin was awarded $35,000, Victor Herrera $10,000, Marleni Herrera $20,000, Edwin Simon and Barbara Brodie each were awarded $15,000 (the amount stated in the Brodie interrogatory totalled $16,000, but she was awarded $15,000 in the final judgment). The punitive damage awards were divided between the three defendants apparently based upon evidence as to the relative wealth of that defendant.
[18] The trial judge did not discharge the jury until he and counsel had molded the verdict for the entry of a form of judgment, explaining to the jury that because of the complexity of the case:

If in the course of molding the verdict, we come up with a problem that must be answered by the jury, I have the ability because I note only I and my Court people, nobody else as I assured you before know your addresses and your phone numbers. That's the way it will be, that's the way it should be.
If we come up with a problem, I will be in contact with you.
[19] For example, in the abatement in rent allowed vis-a-vis the reduction in rental value as a factor of ascertainable loss.
[20] Apparently the distribution of the punitive damages awarded against the three defendants was based upon the extent of the wealth of each.
[21] The question asked in the interrogatories concerning Curry's claim for common law fraud as a basis for punitive damages is as follows:

8. Do you find that the conduct of the defendant or defendants referred to in answer # 1 was actuated by malice or was an act accompanied by a wanton and willful disregard of the rights of another?
[*] Stated as $3,500 in Interrogatory.
[*] Factors (a), (b) and (c) total $1,430, not $1,500.