938 A.2d 169 (2008)
397 N.J. Super. 520
JEFFERSON LOAN COMPANY, INC., Plaintiff-Respondent/Cross-Appellant,
v.
Rubena A. SESSION, Defendant, and
Shameka N. Grandberry, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued on October 9, 2007.
Decided January 15, 2008.
*171 Andrew R. Wolf, North Brunswick, argued the cause for appellant/cross-respondent (Galex Wolf, LLC, attorneys; Christopher J. McGinn, Richard Galex, Rebecca Schore, and Mr. Wolf, on the brief).
Steven Siegel, Hackensack, argued the cause for respondent/cross-appellant (Sokol, Behot & Fiorenzo, attorneys; Joseph B. Fiorenzo, of counsel and on the brief; Mr. Siegel, on the brief).
David McMillin argued the cause for amicus curiae Legal Services of New Jersey (Melville D. Miller, Jr., attorney; Henry P. Wolfe and Mr. McMillin, on the brief).
Before Judges WEISSBARD, GILROY, and BAXTER.
The opinion of the court was delivered by
GILROY, J.A.D.
Defendant Shameka N. Grandberry, a co-signor of a retail installment sales contract *172 (RISC), appeals from the July 20, 2006, order of the Law Division, which granted partial summary judgment in favor of plaintiff Jefferson Loan Company, dismissing Counts Three and Four of her counterclaim, alleging violations of the Consumer Fraud Act[1] (CFA) and the Truth-In-Consumer, Contract Warranty and Notice Act[2] (TCCWNA). Although there does not appear to be a separate order, the effect of that order also denied Grandberry's cross-motion for summary judgment on those two counts of her counterclaim.
Plaintiff cross-appeals from the July 10, 2006, order that: 1) granted Grandberry's motion for partial summary judgment on Counts One and Two of her counterclaim, alleging violations of Article 9 of the New Jersey Uniform Commercial Code[3] (UCC); and 2) dismissed plaintiff's complaint for failure to state a claim upon which relief could be granted.[4] Plaintiff also appeals from the amended order of July 28, 2006, which entered judgment in favor of Grandberry in the amount of $7,347.21 on the UCC claims.
The primary question presented on appeal is whether an assignee of a RISC can be held liable under the CFA for the assignee's own unconscionable commercial practices and activities related to the assignee's repossession and collection practices, in connection with the subsequent performance of the RISC. Because we answer the question in the affirmative, we reverse that part of the order of July 20, 2006, which dismissed Count Three of Grandberry's counterclaim alleging violations of the CFA, and remand that count to the trial court for further proceedings consistent with this opinion. We affirm that part of the order of July 20, 2006, which dismissed Count Four of the counterclaim. We also affirm the orders of July 10, 2006, and July 28, 2006.

I.
Plaintiff is a finance company that engages in the financing of automobiles by purchasing RISCs from automobile dealers. Plaintiff also offers credit life and credit disability insurance through the dealers, insuring the life and health of the borrowers, as well as property insurance on the financed automobiles. Plaintiff receives a commission on each policy of insurance sold.
On July 24, 2000,[5] Rubena Session entered into a RISC with National Auto Sales, Inc., for the purchase of a 1992 Honda Accord automobile for $10,091.20. Session paid $1,000 down at the time of purchase and financed $11,996.43, representing $9,091.20 principal; $257.64 for credit life insurance; $502.59 for credit disability insurance; $200 for property insurance; $145 for title registration fees; and $1,800 for GAP insurance[6] and additional *173 un-itemized "dock fees." Although National, not plaintiff, sold the GAP insurance, plaintiff was named as the lender thereon. The RISC also included a $6,147.57 finance charge at the rate of 22.007% interest per annum, for a total sales price of $19,144. The RISC required that the total sales price (less the $1,000 down payment) be repaid in forty-eight monthly payments of $378 each, commencing August 23, 2000, and ending July 23, 2004.[7] Grandberry co-signed the RISC on behalf of Session.
Plaintiff provided RISC forms to National. Under the RISC, plaintiff was required, upon default, to provide a rebate for unearned interest.[8] The RISC contemplated compliance with Article 9 of the UCC, providing that upon default, the creditor would have "all the remedies of a secured party under the [UCC]" and that any notice required under the UCC "will be reasonable if we send it to your address shown [on the contract] at least five days before the event with respect to which notice is required." On the day of the installment sale, plaintiff advanced National the funds for the purchase and assignment of the RISC. On assignment, plaintiff became the holder of the title to the automobile.
Session made two payments, totaling $1,115, on the RISC: $737 on August 24, 2000; and $378 on October 3, 2000. After Session defaulted, plaintiff, without prior notice to either Session or Grandberry, arranged for Professional Process Services (PPS) to repossess the automobile on December 19, 2000. Plaintiff charged Session's account $500 as a repossession fee, paying $380 to PPS for its services. Plaintiff cannot explain the additional $120 charged to Session's account. Although plaintiff sold the credit life and credit disability insurance, which had a term of 48 months, it failed to cancel the insurance policies, saving the unearned premiums, notwithstanding the RISC provided an assignment from the borrowers of "unearned premiums" to the holder of the RISC.
On December 19, 2000, plaintiff sent a notice to Session and Grandberry, stating that because the car payments had not been made, plaintiff had repossessed the automobile. The notice, however, was only sent to Session's residence as indicated on the RISC, not to Grandberry's address, which had been provided to National on other loan documents. The notice provided in pertinent part "[t]o redeem your vehicle, you will have to pay the entire amount owed and expenses. You may purchase your vehicle back at any time before it is sold. Information on the sale date will be supplied to you upon request." The notice further provided that "[i]f you wish to buy back your vehicle, the following list shows the entire amount you owe and all other expenses." The notice then set forth the total amount required for Session and Grandberry to purchase *174 the automobile back from plaintiff: $17,029 for the gross unpaid balance; $20 for late charges; and $500 for repossession expenses, for a total amount of $17,549, together with storage fees assessed at $25 per day.
Notwithstanding the December 19, 2000 notice, plaintiff did not sell the automobile at a public or private sale, but rather, returned the automobile to National "with no recourse." Under the arrangement, National was obligated to make all remaining monthly payments on the automobile. When the last payment was made, plaintiff would assign the automobile title over to National, which could then resell the motor vehicle. After repossession, plaintiff did not send any further notices to Grandberry or Session, informing them of their rights of redemption or of plaintiff's intended method of disposition.
On receiving possession of the automobile from plaintiff in December 2000, National made five payments on the account, totaling $1,612, the last payment having been made on August 29, 2001. When National made two payments after the due date, plaintiff assessed a $10 late fee on each payment and charged the fees to Session's account, not National's account. Although plaintiff was aware that National had ceased making payments, plaintiff never attempted to retrieve the automobile from National or arrange for a sale of the collateral.
During the time National was making the loan payments, it fraudulently obtained a duplicate motor vehicle title, sold the automobile, and retained the funds. Plaintiff first learned that the automobile had been unlawfully sold by National five years after the event, when it received copies of the motor vehicle's title documents from Grandberry during the course of discovery in this action.
On January 4, 2002, plaintiff filed a complaint against Session only for monies due under the RISC. Session defaulted, and a judgment was entered against her on March 7, 2003, in the amount of $20,758.22. Because plaintiff was not able to collect from Session on the judgment, plaintiff caused that judgment to be vacated by order of court on August 6, 2003. On the same day, plaintiff filed an amended complaint, adding Grandberry as a defendant. The complaint did not state that plaintiff had repossessed the motor vehicle; rather, it only demanded judgment in the amount of $19,649.93, "plus accruing interest to the date of judgment[,] plus costs." This amount was itemized as "$17,544.00, plus interest from 1/11/2001 to 7/25/2003 in the sum of $157.61 for a total of $17,701.61" from a "money loaned account . . . in default," and $1,948.32 for "attorney fees of 20% of the first $500 and 10% of the excess."[9]
On August 23, 2005, Grandberry filed a second amended answer and counterclaim for damages, alleging violations of the UCC (Counts One and Two); of the CFA (Count Three); and of the TCCWNA (Count Four). After discovery, Grandberry moved for summary judgment on all counts of her counterclaim and for dismissal of plaintiff's complaint for failure to state a cause of action. Plaintiff cross-moved for dismissal of Counts Three and Four of the counterclaim only.
Following oral argument on March 31, 2006, the trial judge granted plaintiff partial *175 summary judgment, dismissing Counts Three and Four of the counterclaim. The judge determined that plaintiff had not directly participated in the sale of the automobile with National, and that the CFA only applied to unconscionable commercial practices in connection with the sale or advertisement of merchandise or real estate, not to the loan collection or repossession activities of an assignee of a RISC. The judge also dismissed the TCCWNA claim on the basis that the Act only applied to express contracts or offerings, not to the failure of a secured party to provide a notice to a debtor concerning the repossession and disposition of collateral. A confirming order was entered on July 20, 2006. In the interim, the matter was continued, with the parties directed to submit additional briefs on Grandberry's motion pertaining to the UCC claims.
On July 10, 2006, the judge issued a written opinion, determining that plaintiff had violated the UCC by: 1) not disposing of the repossessed motor vehicle in a commercially reasonable manner, thereby depriving Grandberry of the resale value of the motor vehicle; and 2) not providing an explanation of the deficiency forming the basis of the action against Grandberry. The judge also dismissed the complaint for failure to state a claim on which relief could be granted, based on the absence of any facts in the complaint supporting the cause of action, "[t]he plaintiff's complaint fails to provide any statement of facts. There is no information about the repossession or disposition [of the automobile]. It only makes the conclusionary allegation that money is due." A confirming order was entered the same day. An amended order was entered on July 28, 2006, directing plaintiff pay Grandberry the statutory penalty of $7,347.21 pursuant to N.J.S.A. 12A:9-625. This appeal and cross-appeal followed.
On appeal, Grandberry argues:
POINT I.
THE CONSUMER FRAUD ACT APPLIES TO JEFFERSON LOAN'S ACTIONS IN SUBSEQUENT PERFORMANCE OF THE RISC; ITS REPOSSESSION AND COLLECTION ACTIVITIES CONSTITUTE UNCONSCIONABLE BUSINESS PRACTICES.
A. THE COURT ERRED IN DISMISSING MS. GRANDBERRY'S CFA CLAIMS.
B. THE EXPANSIVE CFA APPLIES TO THE SUBSEQUENT PERFORMANCE OF A MOTOR VEHICLE SALE AND EXTENSION OF CREDIT.
1. THE TEXT OF THE CFA APPLIES TO JEFFERSON LOAN'S PERFORMANCE OF THE CREDITOR'S OBLIGATIONS UNDER THE RISC.
2. THE LEGISLATURE HAS NOT INTENDED TO EXEMPT REPOSSESSION ACTIVITIES FROM CFA LIABILITY.
i. THE CFA AND [UCC] TEXTS DO NOT PRECLUDE CFA CLAIMS FOR [UCC] VIOLATIONS.
ii. THERE ARE NO SHARP CONFLICTS BETWEEN THE NJUCC AND THE CFA SO AS TO PRECLUDE LIABILITY UNDER THE CFA.
3. EXEMPTING ASSIGNEES FROM LIABILITY UNDER THE CFA FOR THEIR REPOSSESSION AND COLLECTION ACTIVITIES WOULD LEAD TO AN UNDESIRABLE RESULT.
4. JEFFERSON LOAN'S ACTIONS CONSTITUTE DECEPTIVE *176 AND UNCONSCIONABLE BUSINESS PRACTICES UNDER THE CFA.
5. MS. GRANDBERRY SUFFERED AN ASCERTAINABLE LOSS.
POINT II
THE COURT ERRED IN DISMISSING MS. GRANDBERRY'S CLAIMS UNDER TCCWNA AS THE FAILURE TO PROVIDE AN ADEQUATE DEFICIENCY DEMAND VIOLATES THE ACT AND THERE ARE NO DISPUTED FACTS AS TO JEFFERSON LOAN'S TCCWNA LIABILITY.
A. BACKGROUND OF TCCWNA.
B. JEFFERSON ADMITS IT FAILED TO PROVIDE MS. GRANDBERRY WITH THE CONSUMER NOTICE REQUIRED BY NEW JERSEY LAW.
C. TCCWNA APPLIES TO THE FAILURE TO PROVIDE REQUIRED NOTICES.
On cross-appeal, plaintiff argues:
POINT I.
THE COURT BELOW ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF GRANDBERRY WITH RESPECT TO GRANDBERRY'S COUNTERCLAIM ARISING UNDER THE UNIFORM COMM[]ERCIAL CODE, BECAUSE A REVIEW OF THE RECORD ON APPEAL DISCLOSES THAT THERE EXIST NUMEROUS GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER JEFFERSON ACTED IN A "COMMERCIALLY REASONABLE" MANNER IN CONNECTION WITH THE REPOSSESSION OF THE COLLATERAL FOLLOWING GRANDBERY'S DEFAULT UNDER THE LOAN.

II.
A trial court will grant summary judgment to the moving party "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c).
On appeal, "the propriety of the trial court's order is a legal, not a factual, question." Pressler, Current N.J. Court Rules, comment 3.2.1 on R. 2:10-2 (2008). "We employ the same standard that governs trial courts in reviewing summary judgment orders." Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).

III.
Grandberry's claims center around plaintiff's collection activities enforcing its rights under the RISC. Grandberry contends that although plaintiff's collection activities as a secured party were subject to the provisions of the UCC, plaintiff intentionally undertook actions outside of the remedies provided by the UCC to her detriment.
In Point I, Grandberry argues that the CFA applies to plaintiff's conduct in the subsequent performance of the RISC, "irrespective of [plaintiff's] status as an assignee." Grandberry contends that *177 after plaintiff had repossessed the automobile, plaintiff improperly returned the automobile to National, rather than disposing the collateral by private or public sale, pursuant to the UCC. N.J.S.A. 12A:9-601(b); N.J.S.A. 12A:9-609; N.J.S.A. 12A:9-610.[10] Grandberry asserts that plaintiff's improper disposition of the automobile deprived her of having the net proceeds of the sale applied to the secured obligation, thereby reducing her indebtedness under the RISC. N.J.S.A. 12A:9-615.[11] Amicus supports Grandberry's contention that the CFA applies to the direct conduct of an assignee of a RISC. Plaintiff counters that the CFA does not apply to the assignee of a secured loan as a matter of law. We conclude that an assignee of a RISC can be held liable under the CFA, for its own unconscionable commercial activities in the subsequent performance of the assigned contract.
A private party may recover on a cause of action under the CFA if the party demonstrates that the defendant committed an unlawful practice under the CFA and that the aggrieved party suffered an ascertainable loss as a result thereof. N.J.S.A. 56:8-19. The heart of the CFA is contained in N.J.S.A. 56:8-2, which provides in pertinent part:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby. . . .
The CFA forbids affirmative acts and knowing omissions that constitute deceptive trade practices, as well as violations of certain regulations adopted by the Division of Consumer Affairs. Barry v. Arrow Pontiac, Inc., 100 N.J. 57, 494 A.2d 804 (1985). Affirmative acts prohibited by the CFA include deception, fraud, false pretenses, false promise, misrepresentation, and unconscionable commercial practices. N.J.S.A. 56:8-2. The CFA is "one of the strongest consumer protection statutes in the nation." Cox v. Sears Roebuck, 138 N.J. 2, 15, 647 A.2d 454 (1994). "Courts have repeatedly stressed that similar to other remedial legislation, the [CFA] should be construed liberally in favor of consumers." Ibid. Moreover, "[t]he history of the [CFA] is one of constant expansion of consumer protection." Gennari v. Weichert Co. Realtors, 148 N.J. 582, 604, 691 A.2d 350 (1997). Accordingly, we "deem it our responsibility to construe the [CFA] broadly, not in a crabbed fashion." New Mea Constr. Corp. v. Harper, 203 N.J.Super. 486, 502, 497 A.2d 534 (App.Div.1985).
Because of the unforeseeable varieties of abuses that are continually devised *178 to take advantage of consumers, trial courts are instructed to interpret the CFA broadly in determining the range of endeavors that fall under its protective umbrella:
Given that "[t]he fertility of [human] invention in devising new schemes of fraud is so great . . .," the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations. [Lemelledo v. Beneficial Mgmt., 150 N.J. 255, 265, 696 A.2d 546 (1997) (quoting Kugler v. Romain, 58 N.J. 522, 543 n. 4, 279 A.2d 640 (1971)).]
The CFA was enacted by the Legislature in 1960, L. 1960, c. 39, with the purpose of protecting the consumer "`against imposition and loss as a result of fraud and fraudulent practices by persons engaged in the sale of goods and services.'" Scibek v. Longette, 339 N.J.Super. 72, 77, 770 A.2d 1242 (App.Div.2001) (quoting Fenwick v. Kay Am. Jeep, 136 N.J.Super. 114, 117, 344 A.2d 785 (App. Div.), rev'd on other grounds, 72 N.J. 372, 371 A.2d 13 (1977)). The Legislature amended N.J.S.A. 56:8-2 in 1967 to apply not just to the acts or omissions of an individual in the "sale or advertisement" of merchandise or real estate, but also "with the subsequent performance of such person aforesaid." L. 1967, c. 301, § 2. The CFA was further expanded by amendment in 1971 to apply to "unconscionable commercial practices," as well as to misrepresentations and omissions. L. 1971, c. 247, § 1; see also Cox, supra, 138 N.J. at 15, 647 A.2d 454
"Unconscionability" has been defined as "`an amorphous concept obviously designed to establish a broad business ethic. The standard of conduct that the term `unconscionable' implies is lack of `good faith, honesty in fact and observance of fair dealing.'" Cox, supra, 138 N.J. at 18, 647 A.2d 454 (quoting Kugler, supra, 58 N.J. at 543-44, 279 A.2d 640). Unconscionability is to be interpreted liberally in order "to effectuate the public purpose of the CFA." Assocs. Home Equity Servs., Inc. v. Troup, 343 N.J.Super. 254, 278, 778 A.2d 529 (App.Div.2001). Lastly, as evidence of the Court's expansive view of the CFA, the phrase "in connection with the sale or advertisement of any merchandise or real estate" has been construed to include the sale of credit. Lemelledo, supra, 150 N.J. at 265, 696 A.2d 546.
Grandberry contends that the CFA prohibits a party from committing an unconscionable commercial practice in the subsequent performance or furtherance of a contract of sale of merchandise, citing Cox, supra, 138 N.J. at 19-20, 647 A.2d 454 (determining that a home improvement contractor may be liable under the CFA for non-compliance with the Home Improvement Practices regulations in making home repairs). Grandberry asserts that the plain language of N.J.S.A. 56:8-2 permits recovery under the CFA against the holder of a RISC, for the holder's own unconscionable commercial activity in a subsequent performance of the assigned contract. Plaintiff argues that the post-sale conduct by an assignee is not subject to the CFA because N.J.S.A. 56:8-2 refers to "the subsequent performance of such person as aforesaid." Plaintiff asserts that "such person" limits the subsequent performance in the statute to the original "seller" only. We disagree.
For a plaintiff to recover under the CFA, the plaintiff need not prove that the defendant was directly involved in the original contract negotiations or sale. We have previously interpreted the CFA as not requiring direct contractual privity between *179 the consumer and the seller of the product or service, thereby allowing indirect suppliers, "whose products are passed onto a buyer and whose representations are made to or intended to be conveyed to the buyer," to be sued under the CFA. Perth Amboy Iron Works, Inc. v. Am. Home Assur. Co., 226 N.J.Super. 200, 211, 543 A.2d 1020 (App.Div.1988), aff'd, 118 N.J. 249, 571 A.2d 294 (1990); see also Neveroski v. Blair, 141 N.J.Super. 365, 376, 358 A.2d 473 (App.Div.1976) ("There is no provision [in the CFA] that the claimant thereunder must have a direct contractual relationship with the seller of the product or service.").
Here, the relationship between Grandberry and plaintiff is stronger than that of the parties in Perth Amboy Iron Works and Neveroski because plaintiff, having stepped into the shoes of National via the assignment of the RISC, is in contractual privity with Grandberry. We are satisfied that the issue presented is controlled by our decision in 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J.Super. 449, 456, 547 A.2d 1134 (App.Div. 1988).
In Sheva Gardens, a fifty-five-unit apartment building occupied by tenants with active leases was purchased at a government auction by defendant Sheva Gardens, Inc., on March 14, 1984. Title was transferred to defendant Bat-Sheva Halperin on October 4, 1984. Defendant Natalie Development, Inc., held itself out as the landlord of the building. Id. at 453-54, 547 A.2d 1134. The sole shareholder of the corporate owner and corporate operator was Bat-Sheva Halperin, and her husband Jack served as president of both corporations. Id. at 454, 547 A.2d 1134. After acquiring title, defendants attempted to increase rents in violation of the local rent control ordinance.
Under the ordinance, properties that were `substantially rehabilitated,' as well as units voluntarily vacated by a tenant, were permanently exempt from rent control. Id. at 454, 547 A.2d 1134. Defendants engaged a contractor to rehabilitate the building, including installation of a new heating system. After a dispute with defendants, the contractor left the job. A new contractor was engaged, but for a substantial period of time, the building was without heat, and some apartments without water. Moreover, the building became infested with vermin, had many broken windows, and had been invaded by squatters because the doors and door locks were broken. Id. at 455, 547 A.2d 1134. Because the building had been declared unfit for human habitation, the last tenant vacated his or her unit on August 9, 1998. Ibid.
Plaintiffs filed an eleven-count complaint against the three corporate defendants, asserting among other matters, violations of the CFA. The trial court dismissed the CFA claims, determining that the CFA was not applicable to the landlord-tenant relationship, where the tenants had been in possession at the time when defendants had purchased the property. On leave to appeal concerning a separate issue, we reversed and remanded the matter to the trial court, and directed that the CFA issues "be submitted to the jury with appropriate instructions and interrogatories from which a judgment could be molded." Id. at 458, 547 A.2d 1134.
Following trial, the jury returned a verdict in favor of plaintiffs, including those claims asserted under the CFA. As to those claims, the trial court entered an advisory judgment setting forth the damages awarded, which were trebled, and counsel fees pursuant to N.J.S.A. 56:8-19. Ibid.
*180 On appeal, we reversed that part of the order dismissing the CFA claims, disagreeing with the trial judge's conclusion that the CFA did not apply, because plaintiffs' claims arose after their leasehold tenancies had commenced. Id. at 464, 547 A.2d 1134. In reversing, we reviewed the legislative history of the CFA as it related to the amendment, which declared "that [the] use of the condemned practices, not only in connection with the `sale or advertisement of . . . real estate,' but also `with the subsequent performance of such person as aforesaid,' to be an unlawful practice." Id. at 465, 547 A.2d 1134 (quoting N.J.S.A. 56:8-2). We determined that although the plaintiffs' complaints did "not deal with unconscionable commercial practices and deception by their previous landlord in inducing them into the landlord-tenant relationships," the allegations were viable under the CFA because they concerned unconscionable commercial practices by the defendants' own acts and omissions "after they collectively occupied the role of landlord." Id. at 466, 547 A.2d 1134. We concluded that "the `subsequent performance' of these defendants was found by the jury to violate all of the provisions of the [CFA]." Id. at 468, 547 A.2d 1134. The same principle applies to the assignee of a RISC.
Our holding is limited to an assignee's own unconscionable commercial practices and activities related to its repossession and collection practices in connection with the subsequent performance of the RISC, not an assignee's derivative liability for the actions of the assignor of the RISC (the seller of the merchandise). Psensky v. Am. Honda Fin. Corp., 378 N.J.Super. 221, 875 A.2d 290 (App.Div.2005).
In Psensky, plaintiff had entered into a RISC with a defendant-automobile dealership for the purchase of an automobile. The dealership assigned the RISC to defendant American Honda Finance Corp. Id. at 223, 875 A.2d 290. Plaintiff filed a class action against various defendants, including the dealership and American Honda, claiming that the dealership had violated the CFA by misrepresenting and not disclosing that it was charging certain registration and title fees that exceeded the amount actually paid to the Division of Motor Vehicles. Id. at 223, 875 A.2d 290. Plaintiff sought to hold American Honda "liable for [the dealership's] wrongdoing through the Federal Trade Commission (FTC) and the New Jersey Retail Installment Sales Act holder doctrines, as well as the holder provisions contained in the parties' [RISC]." Ibid.
American Honda moved for summary judgment, contending that the Federal "Truth in Lending Act (TILA), 15 U.S.C.A. § 1601 to 1667f, trumped the FTC Holding Rule . . . and preempted New Jersey's retail installment sales holder statute, N.J.S.A. 17:16C-38.2 . . ." Ibid. The trial court denied the motion. On leave granted, we reversed, holding "that American Honda's compliance with the TILA is a complete defense to the state claims being asserted against American Honda that are factually based upon TILA disclosure requirements even in the absence of a specific TILA claim in plaintiff's complaint." Id. at 231, 875 A.2d 290.
However, we also concluded in Psensky, that an assignee of a RISC could be found liable under the CFA for its own independent acts: "[a] plaintiff would . . . be entitled to maintain a cause of action under the [CFA], . . . where the assignee's fraud was active and direct. Fraud committed by the assignee before the assignment of the loan would also be independent of and separate from the TILA assignee exemption, and thus actionable." Id. at 231-32, 875 A.2d 290. This is the nature of the claim now asserted.
*181 We recognize that in order to recover on her CFA claims, Grandberry must prove that she suffered an ascertainable loss as a result of plaintiff's deceptive and unconscionable commercial practices. Weinberg v. Sprint Corp., 173 N.J. 233, 237, 801 A.2d 281 (2002). However, Grandberry's claims were not analyzed by the trial court because the court dismissed her CFA claims as a matter of law, determining that an assignee of a RISC could not be subject to damages under the CFA. Because we conclude that an assignee of a RISC may be liable under the CFA for its own unconscionable commercial practices and activities related to its repossession and collection practices in connection with the subsequent performance of a RISC, we reverse that part of the order of January 20, 2006, that dismissed Grandberry's counterclaim for a violation of the CFA. We do not determine whether plaintiff's collection activities constituted unconscionable commercial practices under the CFA, nor do we determine whether plaintiff has sustained an ascertainable loss caused by such practices. We only decide that Grandberry may pursue her CFA claims against plaintiff. Accordingly, we remand Count Three of the counterclaim to the trial court for further proceedings consistent with this opinion.

IV.
Grandberry had argued in the alternative that plaintiff was a seller under the CFA, "because it was directly involved in the sale of the motor vehicle and the extension of credit." Grandberry contends that plaintiff "was no mere assignee of the [RISC] but was in effect a co-venturer with National." In support of her contention, Grandberry notes that: plaintiff had named itself as the creditor on the insurance policies Session had purchased; plaintiff had provided loan papers to Session, indicating that it was the lender; plaintiff returned the motor vehicle to National after repossession; and National was indebted to plaintiff. We reject this argument. Although Grandberry has raised suspicions of a relationship between plaintiff and National, beyond that of assignee-assignor, we agree with the trial court that the record is devoid of sufficient factual evidence supporting Grandberry's contention. Mere suspicions, inklings, or conjectures will not suffice.

V.
Grandberry argues next that the trial court erred in dismissing Count Four of her counterclaim, asserting that plaintiff had violated the TCCWNA by failing to send her a notice of disposition of the collateral, following its repossession of the automobile, before making a claim for a deficiency on the secured obligation. Grandberry contends that plaintiff failed to provide her with an explanation of the deficiency, as required by N.J.S.A. 12A:9-616.
TCCWNA provides in relevant part:
No seller, lessor, creditor, lender or bailee shall in the course of his business offer to any consumer or prospective consumer or enter into any written consumer contract or give or display any written consumer warranty, notice or sign after the effective date of this act which includes any provision that violates any clearly established legal right of a consumer or responsibility of a seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed.
[N.J.S.A. 56:12-15.]
Here, the trial court concluded that the failure, or mere omission, to send a notice of explanation is not a violation of the *182 TCCWNA because the Act, by its terms, only prohibits certain affirmative actions, that is, the offering or signing of a consumer contract, or giving or displaying of consumer warranties, notices, or signs, which violate a substantive provision of law. The trial court's decision is in accord with the plain language of the TCCWNA. Nothing in the TCCWNA suggests that it applies to the mere failure or omission to send a notice to a consumer, even when the notice is otherwise required by another law. Accordingly, we conclude that the trial court properly granted summary judgment, dismissing Count Four of the counterclaim.

VI.
We now address plaintiff's cross-appeal. Plaintiff argues that the trial court erred in granting Grandberry summary judgment on her UCC claims, determining that plaintiff had failed to properly dispose of the automobile after plaintiff had repossessed the collateral. Plaintiff contends that material issues of fact existed concerning whether or not plaintiff had acted in a commercially reasonable manner by returning the vehicle to National. Plaintiff requests that we reverse the order of July 10, 2006, which granted Grandberry summary judgment on her UCC claims, and that we vacate the order of July 28, 2006, which entered judgment against plaintiff on the UCC claims in the amount of $7,347.21. On this issue, we note that plaintiff does not challenge the trial court's computation of damages, only the award thereof. Therefore, we will only address whether the court correctly determined that plaintiff was subject to statutory damages for failing to comply with the UCC.
The UCC provides an aggrieved debtor or obligor of a secured transaction with remedies against the secured party for failure to comply with Article 9 of the UCC. N.J.S.A. 12A:9-625. In addition to a court restraining collection, enforcement or disposition of collateral, on appropriate terms and conditions, N.J.S.A. 12A:9-625(a), an aggrieved party may recover damages against a secured party for "any loss caused by a failure to comply with [Article 9]." N.J.S.A. 12A:9-625(b). An aggrieved party may also recover statutory damages in a consumer-goods transaction. N.J.S.A. 12A:9-625(c) provides:
Persons entitled to recover damages; statutory damages in consumer-goods transactions. Except as otherwise provided in 12A:9-628:
(1) A person that at the time of the failure, was a debtor, was an obligor, . . . may recover damages under subsection (b) for its loss; and
(2) If the collateral is consumer goods, a person that was a debtor or a secondary obligor at the time a secured party failed to comply with this part may recover for that failure in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation or the time-price differential plus 10 percent of the cash price.[12]
Here, contrary to plaintiff's argument, the trial court not only awarded statutory damages based on plaintiff's failure to dispose of the automobile in a commercially reasonable manner after having repossessed *183 the collateral, but also because plaintiff failed to serve Grandberry with a notice of explanation prior to instituting the deficiency collection action. N.J.S.A. 12A:9-616(b). We are satisfied that the trial court correctly awarded plaintiff statutory damages pursuant to N.J.S.A. 12A:9-625(c).
Every aspect of a secured party's disposition of any collateral, including the method, manner, time, place and terms must be "commercially reasonable." N.J.S.A. 12A:9-610. In determining whether disposition of collateral was commercially reasonable, a court looks to every aspect of the disposition, including the depreciated value, advertising, length of time between repossession and resale, appraisal, price, and normal circumstances. Sec. Sav. Bank, SLA v. Tranchitella, 249 N.J.Super. 234, 239-40, 592 A.2d 284 (App. Div.1991).
We conclude that plaintiff's actions in repossessing the automobile and turning the vehicle back to National, with a view of permitting National to retain possession of the vehicle for a period of almost four years while interest accumulated on Grandberry's obligation, rather than plaintiff immediately selling the vehicle at a private or public sale pursuant to the UCC, constituted a commercially unreasonable disposition of the collateral. Plaintiff's method of disposition deprived Grandberry of the benefit of having the proceeds of any sale applied against her indebtedness under the RISC.
Plaintiff contends that the trial court erred in granting summary judgment on the UCC claims, asserting that it had raised material issues of fact concerning whether it had acted in a "commercially reasonable" manner following repossession of the automobile. Plaintiff asserts that "there is no bright-line rule in New Jersey that holds that a secured creditor's failure to hold a sale means that the secured creditor is, as a matter of law, `commercially unreasonable' within the meaning of N.J.S.A. 12A:9-610(b)." We agree that the issue is generally one of fact. However, if the evidence presented to the trial court is so one sided, that the moving party must prevail as a matter of law, summary judgment should be granted. Brill, supra, 142 N.J. at 540, 666 A.2d 146; B.O.C. Group v. Chevron Chem. Co., 359 N.J.Super. 135, 150, 819 A.2d 431 (App. Div.2003).
Here, it is undisputed that plaintiff repossessed the automobile and turned it back to National pursuant to their agreement, rather than selling the vehicle and applying the net sale proceeds against the indebtedness. Moreover, after plaintiff returned the vehicle to National, plaintiff never inquired as to the whereabouts of the motor vehicle, and only learned that National had improperly sold the automobile five years later through discovery in the present action. Accordingly, plaintiff did not dispose of the automobile in a commercially reasonable manner. Once plaintiff took possession of the automobile, it was required to dispose of the vehicle in accordance with the UCC.
Moreover, in a consumer goods transaction, in which "a consumer obligor is liable for a deficiency" under N.J.S.A. 12A:9-615, the secured party shall provide a notice of explanation of the deficiency, after it makes disposition of the collateral and before the secured party "first makes written demand on the consumer obligor after the disposition for payment of the deficiency." N.J.S.A. 12A:9-616(b)(1)(A). Here, plaintiff failed to provide the required statutory explanation to Grandberry before instituting suit, notwithstanding that plaintiff had repossessed the automobile. Accordingly, we are satisfied that the trial judge correctly determined that *184 plaintiff was subject to statutory damages, for failing to comply with the provisions of the UCC, after it repossessed the automobile and before instituting suit. N.J.S.A. 12A:9-625(c).
We reverse that part of the order of July 20, 2006, which granted summary judgment on Count Three of plaintiff's counterclaim, alleging a violation of the CFA, and remand that count to the trial court for further proceedings consistent with this opinion. We affirm the grant of summary judgment, dismissing Count Four of the counterclaim, alleging a violation of the TCCWNA. We affirm the orders of July 10, 2006, which granted Grandberry summary judgment on the UCC claims and dismissed plaintiff's complaint for failure to state a claim upon which relief could be granted. We also affirm the order of July 28, 2006, which entered judgment in favor of Grandberry in the amount of $7,347.21 on the UCC claims.
Affirmed in part; reversed in part; and remanded to the trial court for further proceedings consistent with this opinion.
NOTES
[1] N.J.S.A. 56:8-1 to -20.
[2] N.J.S.A. 56:12-14 to -18.
[3] N.J.S.A. 12A:9-101 to -710.
[4] Although plaintiff cross-appealed from the entire order of July 10, 2006, plaintiff did not brief the issue concerning the trial court's dismissal of plaintiff's complaint for failure to state a claim upon which relief could be granted. Accordingly, we deem the issue waived. Pressler, Current N.J. Court Rules, comment 3 on R. 2:6-2 (2008); see also Zavodnick v. Leven, 340 N.J.Super. 94, 103, 773 A.2d 1170 (App.Div.2001).
[5] Although the RISC is dated July 24, 2000, the date affixed next to the signature of the purchaser is July 25, 2000.
[6] GAP car insurance is insurance coverage that "will pay the difference between the actual cash value of the vehicle and the current outstanding balance on your loan. . . ." The insurance is designed to protect you "if your car has been totaled by accident [or] theft, . . . [t]he amount between your insurance deductible and the loss from this financial shortfall is the `gap'" that this insurance covers. http://www.carinsurance.com/kb/content10049. aspx.
[7] Because the RISC was for a fixed term of forty-eight months, commencing August 23, 2000, the maturity date under the instrument should have been July 23, 2004. However, in its answer to interrogatories, plaintiff stated that the maturity date of the note was September 25, 2004, and appears to have used that date for the purpose of computing interest after the maturation of the RISC.
[8] Part III of the RISC states in relevant part: "Demand for Full Payment and Additional Remedies on Default. [I]f you default as provided above, all your payments may become due at once and we may sue you for the total amount you owe, less any unearned Finance Charge computed as if you had paid in full. . . ."
[9] See N.J.S.A. 17:16C-42(d) ("The retail installment contract or retail charge account may provide for the payment of attorney's fees not exceeding 20% of the first $500.00 and 10% on any excess of the amount due and payable under such contract or account when referred to an attorney, not a salaried employee of the holder of the contract or account, for collection.").
[10] The three statutes are contained in Article 9 of the present UCC, which became effective June 26, 2001. The actions complained of by Grandberry, in plaintiff repossessing the automobile and returning the automobile to National, rather than selling the collateral at a public or private sale, occurred in December 2000. Because the amendments did not substantially affect the claims, we cite to the present UCC, rather than the former sections of N.J.S.A. 12A:9-501, N.J.S.A. 12A:9-503, and N.J.S.A. 12A:9-504, respectively. As discussed infra, Grandberry also complains of plaintiff not providing her with a letter of explanation of the deficiency sought in the action, before instituting suit against her in 2005, contrary to the present UCC.
[11] Formerly, N.J.S.A. 12A:9-504.
[12] A similar provision existed in the former UCC under Section N.J.S.A. 12A:9-507(1). The primary difference, however, under the present code is that the penalty section is applicable to a secured party's non-compliance with any provision of Article 9, whereas the former Section 9-507 was limited to the secured party's non-compliance with provisions of only that Part of Article 9. See N.J.S.A. 12A:9-625, Official Comment 2.