**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4839-16T2

D.N.,

    Plaintiff-Respondent,

v.

T.G.,

    Defendant-Appellant.

_____

          Submitted January 23, 2019 – Decided February 15, 2019

          Before Judges Rothstadt and Natali.

          On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-0608-15.

          T.G., appellant pro se.

          D.N., respondent pro se.

PER CURIAM

Defendant T.G.[1] appeals from the Family Part's May 24, 2017 order that required him to pay $52,661.47 in support arrears and sanctions and 40% of his children's college expenses. On appeal, defendant argues that the court failed to properly consider the Newburgh factors in establishing his obligation to pay for his children's college expenses and incorrectly determined his ability to pay amounts previously ordered by the court. After conducting a thorough review of the record in light of the arguments raised on appeal, we affirm in part, reverse in part, and remand for further proceedings based on the existing record.

I.

This appeal represents the latest chapter in this heavily litigated and contentious matrimonial matter. We discuss the complicated procedural history because it relates to the May 24, 2017 order, and necessarily informs our decision.

On September 27, 2005, the court entered a Dual Judgment of Divorce (JOD), which dissolved the twelve-year marriage between plaintiff D.N. and defendant, and incorporated a Property Settlement Agreement (PSA). Article I of the PSA addressed child custody, visitation, and support for the parties' two

---

[1] We refer to the parties and their children by initials to protect their privacy interests, and to maintain confidentiality.

A-4839-16T2

children, S.G. and H.G. Pursuant to section 1.3, the parties agreed that plaintiff would pay the first $250 per child, per year in unreimbursed medical expenses and defendant would pay the next $1000. Section 1.6 required defendant to pay 50% of the cost of religious education for the children, up to a total cost of $3500 per year. With regard to the children's college expenses, section 1.11 states that "[t]he parties agree that college education shall abide the event and shall be governed by the existing New Jersey law."

Over the next decade, the parties engaged in unrelenting post-judgment motion practice and related litigation, primarily involving allegations of sexual abuse by defendant, and his failure to comply with the financial obligations set forth in the PSA. Specifically, on September 6, 2005, plaintiff filed a Title Nine abuse and neglect complaint, pursuant to N.J.S.A. 9:6-1(e) and 9:6-8.21(c)(3), against defendant alleging that he had sexually abused their children. The Title Nine action, in which the Division of Youth and Family Services (Division)

ultimately intervened,[2] lasted nearly two years, during which time defendant was precluded from seeing or communicating with S.G. and H.G.[3]

On February 15, 2006, plaintiff "knowingly, willingly and voluntarily," stipulated that he abused or neglected S.G. by showering nude with him. Specifically, defendant admitted to "using poor boundaries and may have placed the minor at risk for emotional harm." The Title Nine trial commenced a few months later. In light of defendant's stipulation, the court denied plaintiff's request for a plenary fact-finding on the other allegations of abuse and neglect. Instead, the court heard from eleven witnesses over the course of sixteen days in order "to reach a dispositional determination concerning [defendant's] future contact with S.G. and H.G."

---

[2] Pursuant to L. 2012, c. 16, effective June 29, 2012, the name of the Division of Youth and Family Services was changed to the Division of Child Protection and Permanency.

[3] In July 2008, defendant filed a lawsuit against plaintiff, her father and mother, and three psychologists, who he alleged falsely claimed that he sexually abused the children. After the trial court dismissed the complaint, we affirmed the dismissal as against plaintiff, her parents, and one psychologist, but reversed and remanded for further proceedings with respect to the remaining two psychologists. T.G. v. Kaplan, No. A-5523-08 (App. Div. March 23, 2011). Because the parties have not included a copy of the transcript from the Title Nine matter in the record, we base our recitation of the facts from our unpublished opinion.

A-4839-16T2

In its oral decision, the court concluded that defendant "had inflicted emotional harm on the children by exposing them to his naked body." The court determined that H.G. suffered from "posttraumatic stress disorder" and that "both children have suffered and are continuing to suffer from emotional distress caused by the[ir] father exposing himself to them." The court stated that it accepted the findings "that these children were sexually abused by their father . . . ."

Despite the court's findings that defendant's conduct caused harm to the children, the court agreed with the Division's and Law Guardian's recommendation that the children should undergo therapy with a goal toward resuming parenting time with him. By mid-2007, defendant was allowed to see his children again, through supervised visits, and according to defendant his "relationship with [his] children had seemingly been restored" by late-2008. Thereafter, plaintiff moved to Long Island, New York, and a new parenting agreement was signed in 2009, granting plaintiff full residential custody and allowing defendant unsupervised parenting time.

In May 2012, defendant and S.G., then thirteen-years old, got into a physical altercation. According to defendant, after he attempted to discipline his son for swearing at him and his girlfriend, S.G. attacked him. Defendant

maintains he took defensive actions to restrain S.G. by throwing him on a bed and holding him down. According to defendant, during the altercation, S.G. accused defendant of abusing him, stating "Mom told me you physically abused us. That's why you couldn't see us." S.G. added, "You hit us all the time."

Defendant had another altercation involving his children at their B'nai Mitzvah on October 5, 2012. Defendant claimed that S.G. approached him at the synagogue and told him that neither he, H.G., nor plaintiff wanted him at the ceremony. The argument escalated and turned physical, requiring plaintiff's then-boyfriend to restrain S.G.

The next day, defendant cancelled S.G.'s cell phone service and demanded the return of a computer he gave to him as a gift. Defendant claims that absent a single call with his son in which he informed him that defendant's mother had died, he has not spoken to either child since the May 2012 incident.

In support of his claim that his children have consciously avoided having any relationship with him, defendant submitted four text messages he sent to H.G. between August 2013 and July 2014, eight text messages he sent to S.G. between February 2015 and November 2016, and six emails he sent to H.G. from September 2012 to November 2013. During this period, defendant remarried and moved to Alabama. Plaintiff contended that defendant had not seen his

children since 2012, had not spoken to them, and did not inform them of either his marriage or his move to Alabama. Defendant responded that he attempted to contact the children but they failed to respond to his emails or text messages, and refused to pick up the phone when he called.

In addition to causing the estrangement between defendant and his children, plaintiff maintained that defendant willfully failed to pay his support obligations mandated by the PSA. Accordingly, she filed a motion to enforce the PSA and hold defendant in violation of litigant's rights for failing to pay for child care, religious education costs, and other expenses. On April 24, 2014, the court granted plaintiff's motion, and required defendant to pay outstanding child care and Hebrew school expenses.

Shortly thereafter, plaintiff filed a motion to compel defendant to reimburse plaintiff for unreimbursed medical expenses. In response, defendant filed a motion for reconsideration of the April 24, 2014 order. On July 17, 2014, the court granted plaintiff's motion, ordered defendant to reimburse plaintiff for $6049.16 in medical expenses incurred on behalf of the children, and directed him to replenish the balance of the court-ordered bank account utilized for unreimbursed medical expenses. In a separate July 17, 2014 order, the court denied defendant's motion for reconsideration and his request to recalculate his

unreimbursed medical expense obligation. We affirmed the court's July 17, 2014 orders in an unpublished opinion.

As a result of defendant's continued non-compliance with his obligations under the PSA and the court's prior orders, plaintiff file a third enforcement motion. In a February 6, 2015 order, the court found defendant in violation of litigant's rights under Rule 1:10, and ordered defendant to pay plaintiff, pursuant to the April 24, 2014 order: 1) $12,821.26 for child care expenses; 2) $9661.75 for Hebrew School expenses; 3) $8385 for counsel fees; and 4) $2100 in sanctions.

Defendant was also ordered to pay, pursuant to the July 17, 2014 order, $6549.16 for unreimbursed medical expenses incurred on behalf of the parties' children, plus $500 in sanctions, and $400 in sanctions for his failure to maintain a court-ordered minimum balance of $2500 in his bank account for unreimbursed medical expenses. The court ordered defendant to make these payments by February 20, 2015.

When defendant failed to comply with the court's February 6, 2015 order, plaintiff requested that the court issue a bench warrant for defendant's arrest. Defendant responded by filing a cross-motion for reconsideration of the February 6, 2016 order. On April 10, 2015, the court entered an order denying

defendant's motion for reconsideration and scheduling an ability to pay hearing for June 2, 2015, to determine if defendant had "funds to pay arrears as set forth [i]n the parties' February 6, 2015 order." The hearing was not held as scheduled.

On March 23, 2016, plaintiff filed a motion to compel defendant to pay his pro rata share of the children's college expenses. After hearing oral arguments, the court issued an August 19, 2016 order that directed the parties to appear at a plenary hearing: 1) "to analyze the facts of this case under Newburgh v. Arrigo, 88 N.J. 529 (1982) to determine whether defendant has a legal obligation to contribute to the children's college expenses;" and 2) "to analyze the parties' financial status to determine [their] pro rata share[s] of the college expenses." On February 2, 2017 and February 24, 2017, the court held a plenary hearing that addressed both defendant's ability to pay his support arrears, and his obligation to contribute to his children's college expenses.

At the plenary hearing, plaintiff testified that as of the date of the hearing, she was earning a gross salary of $116,000 per year, and would be earning $118,000 per year as of her next paycheck. She testified as to her children's finances. Plaintiff explained that as of September 30, 2016, the balances of her

children's 529 accounts[4] were $2625.12 and $9782.84 for S.G.'s two accounts and $16,700.75 for H.G's account. She stated that S.G's savings account had a balance of $33,122.92, and his Vanguard account had a balance of $12,204.62. She testified that H.G's bank account had a balance of $25,712.16 and her Vanguard account had a balance of $13,542.54. Plaintiff claimed that the children's money was never intended to be used for their college expenses, as she and defendant agreed that they would pay for their children's college educations. In this regard, she testified that the 529 accounts were established for this very purpose.

Defendant called Linda Bruyette, CPA, his personal accountant and the CFO of his company, NorthStar Litigation (NorthStar), as a witness. She testified that NorthStar had a "decent cash flow" in 2012, but it had declined in 2013, 2014, and 2015. In addition, she stated that NorthStar's revenue dropped from 2012 to 2016, and defendant and his partner make half the income they once made. She testified that both defendant and his partner stopped taking a weekly salary, and only received distributions when cash flow was sufficient.

---

[4] Established pursuant to 26 U.S.C.A. § 529, these accounts provide tax advantages to promote individuals to save for college expenses.

A-4839-16T2

Bruyette also stated that NorthStar provided loans to defendant, totaling $2500 per month, to address a significant Internal Revenue Service (IRS) debt, and to satisfy his child support payments. Defendant was challenging his IRS liability, and Bruyette testified that defendant and the IRS entered into an "offer of compromise," whereby defendant's payment are "put on hold" during the appeal process.

Defendant testified as to his personal finances and explained that although his case information statements in 2013 and 2014 listed his salary as $210,000, he did not earn that amount because, as Bruyette stated, he stopped taking paychecks when NorthStar's cash flow was insufficient. He explained that he failed to comply with the court's prior orders because he did not have the money to comply. Defendant conceded, however, that during the litigation, he valued NorthStar as high as $500,000, and at the time plaintiff sought contribution for the children's college expenses, he valued it at approximately $100,000.

Defendant also testified regarding his personal expenses to rebut plaintiff's claims that he was living extravagantly and had the means to pay his support obligations but willfully elected not to pay those court-ordered costs. Defendant acknowledged that he spent approximately $13,000 for his wedding in December 2013, $4000 for his honeymoon in January 2014, and $1100 for a

11

suit and shoes in October and November 2013. However, he maintained that his move to Alabama reduced his monthly expenses and testified that his current $1975 monthly rent was significantly less than what he was paying in New Jersey. Finally, defendant testified to spending a modest $28 per month on haircuts at Life Time Spa and approximately $21 per week on alcohol for personal use in 2014 and 2015.

Defendant also sought to call his business partner, Justin Cooper, as a witness to testify regarding the financial state of NorthStar, and their incomes. On February 17, 2017, the court precluded Cooper's testimony, concluding it was "cumulative and/or irrelevant." The court noted that Cooper's proffered testimony with respect to NorthStar's revenues and expenses, the partners' compensation, and loans to defendant was already provided by Bruyette, and defendant failed to demonstrate that Cooper possessed any relevant financial information that he did not have access to himself. Additionally, the court noted that plaintiff's application to compel defendant to pay his support arrears had been pending for two years, mostly due to adjournments at defendant's request, and "Cooper's proffered testimony would necessarily cause further undue delay without sufficient probative value."

The court entered an order on May 22, 2017, and an amended order and statement of reasons on May 24, 2017. The court found that defendant "has the ability to pay his outstanding arrears and monetary sanctions totaling $52,661.47, pursuant to the . . . February 6, 2015 [order]" and ordered him to pay plaintiff $3000 per month towards that amount until satisfied. In its accompanying statement of reasons, the court noted defendant's "excessive or unnecessary" expenditures, including pet expenses and monthly gym membership costs. The court explained that defendant had the ability to borrow money from NorthStar and had additional potential income from his 30% ownership stake in a court reporting company, NorthStar Deposition Services.

Further, after applying the Newburgh factors, the court ordered defendant to pay "40% of the children's college expenses after the application of the children's 529 accounts, available grants, scholarships, and any other available financial aid." These factors include: "(1) whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education; (2) the effect of the background, values and goals of the parent on the reasonableness of the expectation of the child for higher education; (3) the amount of the contribution sought by the child for the cost of higher education; (4) the ability of the parent to pay that cost; (5) the relationship of the requested

13

contribution to the kind of school or course of study sought by the child; (6) the financial resources of both parents; (7) the commitment to and aptitude of the child for the requested education; (8) the financial resources of the child . . . ; (9) the ability of the child to earn income during the school year or on vacation; (10) the availability of financial aid in the form of college grants and loans; (11) the child's relationship to the paying parent, including mutual affection and shared goals as well as responsiveness to parental advice and guidance; and (12) the relationship of the education requested to any prior training and to the overall long-range goals of the child."  Newburgh, 88 N.J. at 545 (1982).  The court explained that "[b]ased on the financial information presented," defendant can only "reasonably afford the cost of a state school tuition" and limited defendant's tuition obligation to that charged by the State University of New York.

With respect to Newburgh factor one, the court concluded that the parties intended to pay for the children's college expenses, as evidenced by their opening of 529 accounts.  The court further determined that if defendant was still residing in the marital home, he would have contributed to those costs.  As to factor two, the court noted that both parties were college educated and their parents contributed toward their college expenses, and, therefore, "the background values and goals of the parties establish the reasonableness of the

14

children's expectations" that plaintiff and defendant would contribute toward their college expenses.

Under factor three, the court noted the balance in S.G.'s and H.G.'s 529 accounts, and their ability to obtain scholarships and grants which would reduce the financial burden on each parent, and concluded that it was reasonable for each parent to contribute a pro rata share of the college expenses. With respect to factors four, five and six, the court determined that defendant had the ability "to make some contribution" toward college expenses but plaintiff had a "greater ability." It also noted that the children are seeking assistance from their parents to attend four year colleges and each parent has the financial resources to contribute.

As to factor seven, the court determined that H.G. and S.G. have the aptitude and commitment to attend college as reflected by their high standardized test scores. In assessing factors eight, nine and ten, the court acknowledged that "both children have financial resources," and noted the significant balances in their 529, Vanguard, and bank accounts. The court also recognized that "both children have the ability to earn income during the school year, as well as during vacations" and have the ability to seek financial aid.

A-4839-16T2

With respect to factor eleven, the court noted the prior abuse and neglect proceedings and concluded that the lack of relationship between defendant and the children "is not something that should be used to penalize them." The court concluded that there was insufficient evidence presented by the parties to make a finding as to factor twelve.

On appeal, defendant argues that the court failed to properly consider Newburgh factors three, eight, nine, ten, and eleven.[5] Defendant also contends the court failed to follow its February 17, 2017 order by permitting evidence regarding pre-2014 expenses as proof of his current ability to pay. Finally, defendant asserts that the court committed error "by ignoring the actual evidence and assuming facts not in evidence."

With respect to his first point, we agree with defendant that the court's May 24, 2017 order and statement of reasons failed to correlate the court's factual findings to all of the Newburgh factors, and specifically factors four, eight and nine. Further, the court failed to make factual findings regarding each

---

[5] Defendant does not take issue with the court's findings and legal conclusions related to factors one, two, five, six, and seven. As such, we consider any challenges to the court's findings as to those factors waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008) (an issue not briefed on appeal is deemed waived).

child's college expenses, and did not sufficiently explain the basis for requiring defendant to pay 40% of those costs.

However, we disagree with defendant as to Newburgh factors three, ten, and eleven, and conclude the court's findings were supported by substantial, credible evidence. Accordingly, we remand for the court to make additional factual findings as to factors four, eight and nine, and the extent of defendant's contribution to college expenses. We find no merit in defendant's remaining arguments.

## II.

Our review of a trial court's factual findings is limited. We will not disturb a trial court's fact-finding if supported by "adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). Our deference is particularly appropriate "when the evidence is largely testimonial and involves questions of credibility" because the trial judge who has observed and heard witnesses can better assess veracity. Ibid. (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Further, we recognize a family court's "special jurisdiction and expertise." Id. at 413. However, we will reverse a trial court's findings that are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests

17

of justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). In other words, reversal is appropriate when the court's factual findings "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

We exercise broader review with respect to a "trial judge's evaluation of the underlying facts and the implications to be drawn therefrom." Ibid. (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188-89 (App. Div. 1993)). We are compelled to reverse "if the court ignores applicable standards . . . ." Gotlib v. Gotlib, 399 N.J. Super. 295, 309 (App. Div. 2008). Finally, we owe no special deference to the trial judge's "interpretation of the law and the legal consequences that flow from established facts . . . ." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In determining whether a parent should be required to contribute to a child's college costs, a trial court must balance the statutory criteria of N.J.S.A. 2A:34-23(a), the Newburgh factors, and any other relevant facts. Gac v. Gac, 186 N.J. 535, 543 (2006). Once it is established that "college contribution is

warranted, the inquiry turns to the amount of the financial obligation itself." Ricci v. Ricci, 448 N.J. Super. 546, 581 (App. Div. 2017).

Defendant primarily argues that the court committed error in its finding regarding factor eleven because it did not "properly consider the parent/child relationship in determining defendant's obligation to contribute toward the children's college expenses." We disagree and conclude that the judge's findings under Newburgh factor eleven were not "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 59, 605 (2007).

The court's conclusion that the children should not be penalized for their lack of relationship with defendant is supported by substantial, credible evidence. That evidence included defendant's prior stipulation that he abused and neglected his son and plaintiff's testimony that defendant moved to Alabama and remarried without informing his children, repeatedly failed to comply with support orders, and maintained no relationship with either child.

While defendant relied on a series of text messages and emails to his children from September 2012 to November 2016, and uncorroborated attempts to reach his children by telephone, there is no evidence in the record that defendant sought to enforce his visitation rights, or otherwise attempted to

19

engage in therapy to restore the relationship with his children during the past five years. While both children certainly disengaged from their father, in light of defendant's sporadic to non-existent role in their lives over the last five years, we cannot conclude that the court abused its discretion in requiring defendant to contribute to his children's college expenses.

Additionally, even assuming the cause of the alienation was as defendant contends, as the trial court explained, "[a] relationship between a non-custodial parent and a child is not required for the custodial parent or the child to ask the noncustodial parent for financial assistance to defray college expenses." Gac, 186 N.J. at 546. Rather, factor eleven is one of twelve factors that a court must consider.

We reach a similar conclusion with respect to the court's findings as to Newburgh factors three and ten. With respect to those factors, defendant contends that despite the court's acknowledgment that his children "have significant financial resources, can seek financial aid and can get a job," the court's order does not require his children to "apply for aid whatsoever." Defendant's position is contradicted by the explicit terms of the May 24, 2017 order which sequences his contribution to be "after the application of the children's 529 accounts, available grants, scholarships, and any other available

financial aid." Thus, defendant's contribution is not triggered until the children utilize the funds in their 529 accounts, and apply any funds obtained by way of grants, scholarships and financial aid.

However, with respect to factors four, eight and nine, we conclude additional fact finding is necessary. As to factor four, the court determined that defendant had the ability "to make some contribution" to college expenses, and quantified that obligation at 40% of those expenses. However, the court did not determine the gross amount of the college costs, or the net amount of those expenses, after application of the children's 529 accounts, grants, scholarships and available financial aid, that defendant was expected to pay. Without that information, or at a minimum, a reasonable estimate of those gross and net expenses, we are unable to conclude that the court's decision that defendant had the ability to pay 40% of those expenses was supported by substantial, credible evidence.

Further, we are unable to discern from the court's statement of reasons why it set defendant's contribution at 40%, as opposed to some other percentage. In this regard, the court did not explain if that percentage was grounded in the parties' current income or assets. And, while we acknowledge that the court attempted to minimize the financial impact on defendant by limiting, in part, his

percentage contribution to the cost of tuition charged by the State University of New York, as opposed to the cost of tuition at a private college, without an explanation of how the court reached its conclusion that defendant is able to pay 40%, the fact that the tuition expenses may be less than a private college does explain why the court elected 40% in the first instance and why that percentage is consistent with the principles underlying <u>Newburgh</u>.

We similarly conclude that additional factual findings are necessary to support the court's conclusions regarding <u>Newburgh</u> factors eight and nine. With respect to factor eight, while plaintiff testified that the children's Vanguard funds and saving accounts came from inheritances and gifts and "were never intended for the children to spend on their college education," the court made no findings as to these accounts, other than acknowledging their existence. As to factor nine, although the court concluded that both children were capable of earning income during the school year, and while on vacations, the court's statement of reasons, and accompanying order, make no connection between this finding and the court's conclusion that defendant pay 40% of the children's college expenses.

On remand, the court should reconsider <u>Newburgh</u> factor four in light of the actual, or reasonably estimated, college expenses for each child. The court

should also detail the factual and legal basis for any percentage contribution ascribed to plaintiff and defendant. Further, under factors eight and nine, the court should determine a reasonable estimate of the amount each child is capable of earning, and what amount, if any, they should contribute to their college expenses. Additionally, the court should make relevant findings regarding the children's Vanguard and savings accounts to determine if those funds should be utilized to defray their college expenses.

III.

Turning to defendant's second point on appeal, we reject his claim that the court committed error by "not following its previous order regarding the central issue of the hearing." The scope of the plenary hearing was detailed in the court's April 10, 2015 and August 19, 2016 orders. Among the issues before the court was whether defendant's failure to pay his support arrears was willful or excusable. During the plenary hearing, the court considered evidence of defendant's personal bank statements and determined that defendant could have substituted many of his purchases with "less costly alternatives." The issue of defendant's personal expenditures was directly relevant to defendant's willfulness.

A-4839-16T2

Further, the court's decision to preclude Cooper from testifying was based on the court's fully supported finding that Cooper's testimony was duplicative of Bruyette's testimony. In any event, the court permitted defendant to testify extensively regarding his income and expenses, which he described as reasonable and largely business related.

IV.

Finally, we reject defendant's claim that the court "ignor[ed] the actual evidence and assum[ed] facts not in evidence." In support of this argument, defendant maintains the court incorrectly concluded that he had the capacity to earn additional income based on his 30% ownership interest in NorthStar Deposition Services, as there was no evidence that he ever received income from that company. Further, defendant argues that there was no evidence to support the court's finding that he had the ability to borrow funds from NorthStar, as he had not "borrowed money from the company since 2014" and it "no longer has the ability to lend money."

"The issue to be decided at an ability to [pay] hearing closely parallels determinations Family Part judges make on a daily basis concerning the evaluation of financial information provided through documents and testimony," in an "attempt[] to achieve a fair resolution of the economic issues of parties

24

going through the emotionally charged process of divorce." Schochet v. Schochet, 435 N.J. Super. 542, 550-51 (App. Div. 2014).  The hearing's purpose is "simply to determine whether that failure was excusable or willful," or essentially, if "the obligor was able to pay and did not."  Id. at 548.

Here, the court's factual finding regarding defendant's willful non-compliance and his ability to pay his arrears is fully supported by the record.  The court reached its conclusion after reviewing defendant's business and personal expenditures and characterized certain of those expenditures, such as his "pet expenses, . . . high end clothes and shoe purchases, . . . gym memberships . . . , and his honeymoon to Punta Cana," as "excessive or unnecessary."

Further, the court explained that defendant regularly borrowed money to make significant monthly payments to the IRS, and correctly noted that due to the "offer and compromise" between defendant and the IRS, his payment obligations were currently suspended.  The court correctly observed that defendant could have continued to borrow money from NorthStar, which he admitted had a value of at least $100,000, but chose not to.  Based on these actions, the court concluded that defendant "triaged" which debts were important to pay.

To the extent the court erroneously concluded that defendant received income from NorthStar Deposition Services, we find any error harmless as there was sufficient, independent support in the record for the court's findings that defendant had the ability to pay his arrears. Further, defendant has not claimed on appeal that he is unable to pay the $3000 per month ordered by the court to satisfy his arrears based on his current income. As such, whether NorthStar Deposition Services will provide income to defendant in the future is not relevant.

To the degree that we have not specifically addressed any of defendant's arguments, we find them without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part and reversed in part and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4839-16T2